IN THE MATTER OF THE APPLICATION OF
ELLEN GAULKIN, PETITIONER.

Argued November 3, 1975—Decided January 28, 1976.

*Mr. Samuel M. Koenigsberg* argued the cause for petitioner Ellen Gaulkin.

*Ms. Mary Jean Gallagher* and *Ms. Rosemary Higgins Cass* argued the cause for *amicus curiae* New Jersey State Bar Association.

*Mr. Everett M. Scherer* argued the cause for *amicus curiae* Advisory Committee on Professional Ethics.

*Ms. Nadine Taub* argued the cause for *amici curiae* American 'Civil Liberties Union, American Association of University Women, National Council of Jewish Women, National Organization for Women, Women's Political Caucus, Women's Group of Rutgers Law School, Women's Rights in Tenafly, and Women's Equity Action League (*Ms. Cynthia Jacob* and *Ms. Taub* on the brief).

*Ms. Mary Little Parell* argued the cause for *amicus curiae* League of Women Voters of New Jersey.

The opinion of the Court was delivered by

HUGHES, C. J. ██ This application for the review and relaxation of an administrative policy enunciated by the Court is somewhat unusual in nature. It was initiated by a petition filed by one affected by the policy, Mrs. Ellen Gaulkin, wife of a Judge of the New Jersey Superior Court. In a most appropriate way she had sought the views of the Supreme Court as to the propriety of her intended candidacy for public office in view of her husband's judicial position. Upon the expression of our negative opinion, she acceded for the time, although disagreeing with it, and reserved the right to contest further. She is properly here now, as are the *amici* who have also briefed and argued the cause, which in itself is not adversarial in nature. *Cf. In re National Broadcasting Co.,* 64 *N. J.* 476 (1974). Through its chairman the Supreme Court's Advisory Committee on Professional Ethics joined in argument for explication of the reasons relevant to the origin and existence of the policy. There has been no adjudicatory hearing as such, nor indeed is such hearing necessary where the Court is exercising legislatively its constitutional power to formulate court rules and policy. *Cf. American Trial Lawyers Assoc. v. New Jersey Supreme Court,* 66 *N. J.* 258 (1974).

## I.

Since 1948, when the judicial system created by Article VI of the 1947 Constitution came into existence, judges and others officially associated with that court system have been wholly divorced from involvement in partisan or other political activity, as a necessary sacrifice for the sake of judicial integrity and the public appearance thereof. This separation is thought in this State (all judges in New Jersey are appointed) to be indispensable to public confidence in the courts and their probity, impartiality, disinterested objectivity and freedom from outside pressures in their dealing with causes coming before them. Such public confidence in judicial integrity is the foundation (along with Constitution and law) of our courts' power, influence and acceptance as necessary instruments in the effective administration of justice.

In recognition of that concept the people of New Jersey, in adopting our present Constitution, reposed in the New Jersey Supreme Court, a non-political entity, exclusive responsibility for the making of rules concerning practice and procedure in the courts thereby created, and for the admission and discipline of those admitted to the practice of the law. *N. J. Const.* (1947), Art. VI, § II, par. 3. The constitutional voice of the people thus vested in the Supreme Court a responsibility to " 'keep the house of the law in order,' " *American Trial Lawyers Assoc., supra* at 264 (quoting from *Gair v. Peck,* 6 *N. Y.* 2d 97, 111, 188 *N. Y. S.* 2d 491, 502, 160 *N. E.* 2d 43, 51 (1959), *appeal dismissed,* 361 *U. S.* 374, 80 *S. Ct.* 401, 4 *L. Ed.* 2d 380 (1960)), and this responsibility obviously extended to the conduct of judges as well as attorneys in practice. *In re Mattera,* 34 *N. J.* 259, 264–65 (1961).

It was to implement this mandate that our Court perceived the need for extension of the judge's disqualification

from political involvement to include that of the spouse.[1] (To avoid confusion, this opinion will refer to the wife or husband of a judge as the "non-judicial spouse.")

In reaffirming this policy the present Court, through a letter to Judge Gaulkin on December 31, 1973, opined that the candidacy for public office of his spouse represented "a form of political activity which would, unintentionally but seriously, affect public confidence in the judicial system." This was then our position despite an assurance that such candidacy would not involve the typical indicia of political campaigns, such as association with a slate, or acceptance of campaign financing, or solicitation of endorsements, and Mrs. Gaulkin's further belief that her tenure and its incidents would not be subversive of the policy of the Court.

Mrs. Gaulkin, in forbearing her candidacy for the public office involved (an elected member of the Weehawken Board of Education; *N. J. S. A.* 18A:9-4, 18A:9-10, 18A:14-9), suggested that despite such temporary deference she would wish at a later time, *pro bono publico,* to ask the Court more formally to "reconsider the position it has taken." She expressed the hope, too, that meanwhile "the Justices [would] maintain an open mind on the subject so that it can be explored afresh at an early opportune occasion." The instant proceeding represents that occasion for the Court to consider further argument on the merits. But now we view the matter not only in the narrow aspect of reconsidering the views we expressed as to the Gaulkin candidacy, but with the broader reach of reexamining the whole policy of judicial abstention from political involvement and particularly the

---

[1]"Nonetheless when the question has arisen in the past, as it has on several occasions, the Supreme Court has always expressed the view that it is undesirable for the wife of a judge to be politically active, since it invariably creates the impression that the judge himself may be politically active, albeit not openly." [Directive of the Administrative Director, Edward McConnell, No. 17-61, Feb. 7, 1962]

wisdom as well as the constitutionality of the vicarious disqualification of a judge's spouse from that participation.

## II.

 It goes without saying that our system of government is predicated upon the premise that every citizen shall have the right to engage in political activity. It is a basic freedom enshrined in the First Amendment. *Sweezy v. New Hampshire,* 354 *U. S.* 234, 250–51, 77 *S. Ct.* 1203, 1212, 1 *L. Ed.* 2d 1311, 1325 (1957) ; *DeJonge v. Oregon,* 299 *U. S.* 353, 364, 57 *S. Ct.* 255, 260, 81 *L. Ed.* 278, 283–84 (1937). This important right (except of course for the private exercise of the voting franchise) is relinquished by our judges upon ascendancy to the bench. In this state, at least, it has been clearly established that courts do not belong in politics, that the independence of the judiciary depends upon that separation, and that political ties and debts and their accommodation would demean and degrade the courts and ultimately corrupt them. So fixed are these principles that as to the judges themselves the withdrawal of the right of political participation, which enjoys constitutional protection, *see, e. g., Storer v. Brown,* 415 *U. S.* 724, 729, 94 *S. Ct.* 1274, 1278, 39 *L. Ed.* 2d 714, 723 (1974), is based upon the clearest of compelling needs for the decent operation of government.[2] Neither petitioner nor any *amicus* has suggested to the contrary. That question is not issuable in any event, for the Court takes this opportunity to reaffirm in the strongest possible terms its scrupulous adherence to the stern policy of absolute noninvolvement in politics

---

[2]As stated by Chief Judge John J. Parker, "The judge must not only be independent — absolutely free of all influence and control so that he can put into his judgments the honest, unfettered and unbiased judgment of his mind but he must be so freed of business, political and financial connections and obligations that the public will recognize that he is independent." ["The Judicial Office in the United States," 23 *N. Y. U. L. Rev.* 225, 228 (1948)].

of members of the New Jersey judiciary — a policy adamantly enforced during the years of life of the present court system, largely responsible for the high respect in which that system is held throughout the nation, *see K. W. Smith, The Politics of Judicial Reform in New Jersey,* 200–01, 214–15 (University Microfilms, Inc. 1973), and therefore necessary for meticulous preservation in every respect. As once pointed out by Chief Justice Weintraub, this attitude implies no disrespect to the political process as such nor the involvement therein of political parties, but is merely conducive to separation therefrom of the judiciary. *See In re Pagliughi,* 39 *N. J.* 517, 523 (1963).

Historically, the stringent scope of the Court's policy as conceived in 1948 appears to have been a necessity of the times. It was chronologically identified with the American Bar Association Canons of Judicial Ethics, which were adopted by the first Supreme Court under the new court system by *R.* 1:7–6 (1948). But it was particularly needful in New Jersey at that time. That prophylactic policy followed an era during which it was not considered unethical for a judge of courts existing under our 1844 Constitution to participate rather directly in the political process, at least to the extent of making campaign speeches and contributions. And while most of those judges were unconnected with such activities, indeed probably were unknowing of them given the random nature of involvement of the few who were so politically inclined, nevertheless the atmosphere accommodated by that casual and permissive tie with politics was not conducive to a totally independent judiciary. It was almost fortuitous that the pre-1948 system produced so many fine judges and was in fact so seldom touched by the pressure of outside politics. In any event, the turnabout in 1948 was complete, such that there exists today a court system independent of partisan political or other outside pressures of any kind. So was and is being served the interest of the people of New Jersey in an independent judiciary.

## III.

But the years which demonstrated the wisdom of this basic policy have also wrought other changes bearing upon the question now directly before us, namely, whether and to what extent the proscription of all political activity on the part of a judge should extend to the non-judicial spouse.

We focus first upon the trend of modern law which reflects society's realistic appreciation of the independence of both spouses in marriage and more specifically represents modern awareness and sensitivity to individual freedoms, rights, responsibilities and development. A married woman in New Jersey has the right to own property individually; *N. J. S. A.* 37:2–12; is liable for debts contracted in her own name, *N. J. S. A.* 37:2–10; may enter into a partnership with her husband, *N. J. S. A.* 37:2–16.1; may even enter into a criminal conspiracy with him, *State v. Pittman,* 124 *N. J. Super.* 334, 338–40 (Law Div. 1973) ; may testify in court against her husband in certain cases, *Evid. R.* 23 (2) ; and is not compelled to assume her husband's surname as her legal name, *In re Application of Lawrence,* 133 *N. J. Super.* 408, 412 (App. Div. 1975). The coexistence of separate and different interests in an ongoing marriage has also been recognized. In *Immer v. Risko,* 56 *N. J.* 482 (1970), the Court limited the doctrine of interspousal immunity in a woman's negligence action against a defendant who became her husband. The Court rejected the assumption that interspousal tort actions would inevitably disrupt marital harmony. [*Id.* at 488–90]. *See also Small v. Rockfeld,* 66 *N. J.* 231, 241 (1974). In *King v. Greene,* 30 *N. J.* 395, 412 (1959), the Court held that a wife's interest in property held in a tenancy by the entirety could be alienated. We notice too that the evolving recognition of individual spousal interests has resulted in their being viewed as well from the perspective of the male and his role as husband and father. He too is being relieved of the consequences of being fitted into a stereotypic mold. *See, e. g., Weinberger*

*v. Wiesenfeld,* 420 *U. S.* 636, 95 *S. Ct.* 1225, 43 *L. Ed.* 2d 514 (1975) ; *Stanley v. Illinois,* 405 *U. S.* 645, 92 *S. Ct.* 1208, 31 *L. Ed.* 2d 551 (1972).

All of this bespeaks a realistic appreciation of the marriage relationship and the nature of the partnership it embodies:

[T]he marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. [*Eisenstadt v. Baird,* 405 *U. S.* 438, 453, 92 *S. Ct.* 1029, 1038, 31 *L. Ed.* 2d 349, 362 (1972)].

And so it is with an appreciation of the emergence and the social and legal recognition of spousal autonomy and retention of separate identities and interests, notwithstanding the sympathetic relationship of an ongoing marriage, that we turn to the question of spousal political activity, as seen by others in the judicial and professional world.

## IV.

The record before us indicates that no other American jurisdiction, whether by a court having administrative responsibility for the conduct of judges, a judicial ethics commission, or otherwise, has ever undertaken to forbid or limit spousal public or political activity, with the exception of the Association of the Bar of the City of New York, Committee on Professional Ethics, whose Opinion No. 865, 20 *Record of N.Y.C.B.A.* 52 (1965), sought to control political activity of a judge's spouse. It is pointed out to us that such opinion has never been cited with approval in any opinion or other writing since. On the contrary, in voluminous writings of recent years concerning judicial ethics there does not seem to be the slightest suggestion that any prohibition of a spouse's service in or candidacy for public office is either necessary or appropriate. *See, e. g.,* Ainsworth, "Judicial Ethics — The Federal Judiciary Seeks Modern Standards of Conduct," 45 *Notre Dame Law* 470 (1970) ; Armstrong,

"The Code of Judicial Conduct," 26 *Sw. L. J.* 708 (1972); Bayh, "Commentary: On Judicial Ethics," 14 *St. Louis U. L. J.* 667 (1970); Edwards, "Commentary on Judicial Ethics," 38 *Fordham L. Rev.* 259 (1969); Frankel, "Judicial Ethics and Discipline for the 1970's," 54 *Judicature* 18 (1970); Goodell, "Judicial Participation in Charitable Activities," 25 *Record of N.Y.C.B.A.* 648 (1970); Rehnquist, "Sense and Nonsense About Judicial Ethics," 28 *Record of N.Y.C.B.A.* 694 (1973); "Judicial Ethics, A Symposium," 35 *Law & Contemp. Prob.* 1 (1970); "Symposium — The Proposed Code of Judicial Conduct," 9 *San Diego L. Rev.* 785 (1972); "Symposium on the Code of Judicial Conduct," 1972 *Utah L. Rev.* 333; Note, "Discipline of Judges in Maryland," 34 *Md. L. Rev.* 612 (1974); Note, "Regulation of Judicial Ethics in Utah: Adoption and Enforcement of the Code of Judicial Conduct," 1973 *Utah L. Rev.* 29. Nor has a nationwide survey by questionnaire by the attorney for petitioner developed any similarity to such a firm judicial ban.

A 50-state survey made by our Administrative Director of the Courts (at our direction) discloses no policy concerning the non-judicial spouse essentially comparable to that of New Jersey.[3] Nor does the long-considered Code of

---

[3]However, a pale resemblance thereto is noted in three jurisdictions. By unwritten policy, the spouses of the members of the Supreme Judicial Court of Maine do not engage in any activity in which the judge may not participate, but other levels of courts are not affected. In Missouri, spousal political candidacy for elective office is discouraged, but not by formal rule, though non-judicial spouses hold appointive office on many public boards and commissions. In New York, decision is made on an ad hoc basis; if the spousal activity is an independent endeavor, and not a guise by which the judge is trying to circumvent the rule against outside activities, there is no apparent concern. We would consider these few variations from the overwhelming majority policy as *de minimis* in the present context. And in many American jurisdictions judges are elected, their political conduct being dealt with by the American Bar Association Code of Judicial Conduct, *infra*, which may reduce the relevancy of the absence of policy in those states equivalent to ours with respect to spousal activity.

Judicial Conduct, adopted by unanimous vote of the House of Delegates of the American Bar Asosciation on August 16, 1972 (adopted, after some "tightening" modifications, by our Court on April 3, 1974 in *R.* 1:14 as the New Jersey Code of Judicial Conduct) hint at any such control of activities of the non-judicial spouse although other actions, such as the receipt of certain gifts by spouse or resident family members, are proscribed. Nor with the exception of ABA Formal Opinion 113 (1934) (predicated upon a now outworn concept of spousal domination), has any opinion ever been issued by the American Bar Association's Committee on Ethics and Professional Responsibility (in existence since 1924) to suggest any such control of political or public activities of a judge's spouse.

Reference to the "legislative history" of the adoption of the model Code of Judicial Conduct by the American Bar Association indicates that the Special Committee[4] which recommended its adoption was not unaware of the implications of spousal activity:

The Code refers to a judge's spouse at several points with respect to the effect of the spouse's conduct or interests on the conduct of the judge. Various aspects of the subject were discussed in drafting the Code, at a number of sessions and at length.

The Committee was of course aware of the effect on public confidence in a judge that might result from the conduct of a judge's spouse. It was also recognized, however, that restrictions on a judge's spouse might infringe on important personal and political rights the spouse would otherwise enjoy. The Code sought to express the very limited restrictions, direct and indirect, on the spouse's activity that seemed compatible with separate legal and social identity of a spouse that is established by contemporary mores. To the extent the Code did not preclude a type of spousal interest or activity, its silence signified either that such interest or activity would

---

[4]The American Bar Association Special Committee on Standards of Judicial Conduct was chaired by retired Chief Justice Traynor of the California Supreme Court, and included many distinguished judges and lawyers, one of its members being Associate Justice Potter Stewart of the United States Supreme Court.

not reflect adversely on the office of the judge or that attempting to prohibit it would be unwise and perhaps legally invalid.

\* \* \* \* \* \* \* \*

[G]iven the difficulty of differentiating one kind or another of spousal activity as more or less adversely reflective on the judge, we concluded that, for practical reasons as well as on principle, the autonomy of the judge's spouse should simply be accepted as an understood premise of modern life. [Affidavit of Professor Geoffrey C. Hazard, Jr., of Yale Law School, consultant and draftsman for the Special Committee].

Ours, then, has been a conspicuously minority position, designed however to meet a plain exigency, namely, the need to extricate our courts from the sort of pre-1948 entanglements to which we have referred. It reflected as well our determination, to which we still firmly adhere, not to move one inch from the principle of total separation of the judiciary itself from involvement, directly or indirectly, in political activities.

■ Upon the most careful reconsideration, however, we no longer see any confirmed justification for extending that prohibition to the non-judicial spouse. The reasoning supporting extension of the basic policy was based upon our perception that the spousal political activity would seem to embroil the judge in politics, because of an inevitable public belief that the publicly stated views of the political spouse would or must implicate the fundamental thinking of the judge and the court represented by that judge.

■ In light of the strong admonitions of Canon 7 adjuring the abstention by the judge from political activity[5]

---

[5]Canon 7 provides:

(1) A judge should not:
 (a) act as a leader or hold any office in a political organization;
 (b) make speeches for a political organization or candidate or publicly endorse a candidate for public office;
 (c) attend political functions or functions which are likely to be considered as being political in nature;
 (d) solicit funds for or pay an assessment or make a contribution to a political organization or candidate, or purchase tickets for political party dinners, or other functions.

and the Court's undoubted power and determination to enforce such a rule vigorously, we express doubt that spousal political activity per se would involve the judge in the political stream. Where a court is dealing with a First Amendment right (here the political involvement of the non-judicial spouse), fears that its exercise will have undesirable consequences cannot inhibit judicial vindication thereof. *See Bigelow v. Virginia,* 421 *U. S.* 809, 95 *S. Ct.* 2222, 44 *L. Ed.* 2d 600 (1975); *Southeastern Promotions, Ltd. v. Conrad,* 420 *U. S.* 546, 95 *S. Ct.* 1239, 43 *L. Ed.* 2d 448 (1975); *New York Times Co. v. United States,* 403 *U. S.* 713, 91 *S. Ct.* 2140, 29 *L. Ed.* 2d 822 (1971); *Organization for a Better Austin v. Keefe,* 402 *U. S.* 415, 91 *S. Ct.* 1575, 29 *L. Ed.* 2d 1 (1971); *Bond v. Floyd,* 385 *U. S.* 116, 87 *S. Ct.* 339, 17 *L. Ed.* 2d 235 (1966).

◼ As to the community's perception of the spouse's exercise of that right, emerging concepts of spousal independence and autonomy in activities, development, interests, rights and responsibilities lead us to appraise our earlier assessment of probable public discernment and sophistication as no longer realistic. Furthermore, certain disqualification provisions under the Code[6] provide an avenue for appropriate withdrawal of the judge from any matter which would or could embarrass the court, an implicit burden always resting on the judge to be vigilant in detecting possible impropriety or the likelihood of public appearance thereof. *See, e. g., State v.*

---

(2) A judge should resign his office when he becomes a candidate either in a party primary or in a general election for an elective public office.

(3) A judge should not otherwise engage in any political activity.

[6]Under Canon 3C(1), a judge is required to disqualify himself where "his impartiality might reasonably be questioned." The provisions of the Canon envision as a basis for disqualification not only the actual involvement of a spouse, in one way or another, in a judicial proceeding but also the spouse's having *"any other interest* that could be affected by the outcome of the proceeding." [emphasis added]. A similar standard for disqualification is embodied in *R.* 1:12–1(f). *See also N. J. S. A.* 2A:15–49, 50.

*Deutsch,* 34 *N. J.* 190 (1961); *Sebolt v. National Bank of New Jersey,* 140 *N. J. Eq.* 440 (E. & A. 1947); *State v. Overseer of Walpack,* 38 *N. J. L.* 200 (Sup. ·Ct. 1875).

Additionally, our previous position now lacks a persuasive ring when we consider the impact on our judicial system of the publicly expressed views of the wife or husband of a judge as stated in the political forum, and those of a non-judicial spouse who is, let us say, an author, playwright, lecturer, newspaper editor or the like. The former would seem no more invidious than the latter. And one can hardly suppose that the latter, ordinarily, could come within the orbit of legitimate spousal control or judicial concern.

### V.

 We think we have been explicit enough to indicate that while we now see the need and justice of withdrawing the Court's previous disapproval of spousal political involvement, which we do by this opinion, we are equally determined that every precaution shall be taken to assure that the judiciary itself shall continue its careful separation from direct or indirect involvement in politics. We consider that certain amenities of life, and perhaps even some legal rights, have to be sacrificed or curtailed for the larger purpose of avoiding the fact or appearance of participation by the judge in the political effort of a spouse. The administration of justice must be free of such appearance, as well as the fact. *Offutt v. United States,* 348 *U. S.* 11, 14, 75 *S. Ct.* 11, 13, 99 *L. Ed.* 11, 16 (1954); *In re Spitalnick,* 63 *N. J.* 429, 432 (1973); *State v. Deutsch, supra* at 206 (1961). Thus, for instance, despite the theory of *Painter v. Painter,* 65 *N. J.* 196 (1974), recognizing the contribution of both spouses to the marital assets, we would regard the use of any part thereof in the political forum as degrading to the court and plainly within the reach of the adjuration .that the judge abstain from politics. Such assets normally are marked by a lack of an identifiable interest of either spouse, thus at.

least suggesting indirect involvement of the judge.[7] The use of the marital home for a political or fundraising meeting or the making of political contributions from the common family funds would come within this objection. The ordinary courtesy of the judge in accompanying his or her spouse to a political gathering of any kind, or being seen as a political adviser, would have to be foregone. The making of political contributions to the campaign of a spouse of a judge by attorneys or litigants who are or may be involved in practice before that judge would be particularly offensive from an ethical standpoint. A myriad of other circumstances apt to involve the judge or give the public appearance of such political involvement may be imagined, but need not here be enumerated. Suffice it to say that notwithstanding the present relaxation of the policy with regard to the non-judicial spouse, the Court will be vigilant and will deal most strenuously with respect to any encroachment, actual or apparent, of politics upon the judiciary of New Jersey.

We have confidence that in this resolve we shall enjoy the support not only of the present members of our judiciary but those new judges who will be added through the years to enrich and renew the strength of a judicial system that we hope and intend to remain in the first rank of those in the nation.

We identify the maintenance of the traditions and good reputation of this court system as dependent in significant part upon its insulation from politics. It is the intent of the Court to maintain those traditions and that reputation so that they may be passed on, intact and untarnished, to succeeding generations.

---

[7]An exception on an ad hoc basis might one day have to be considered with respect to the non-judicial spouse who wishes to support political activities out of private and separate assets or income, but the non-involvement of the judge's or joint familial assets would have to be established on a clear and convincing basis.

*For relaxation of Administrative Policy*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.