649 A.2d 393

IN THE MATTER OF JUDGE PHILIP A. FENSTER, A
JUDGE OF THE PATERSON MUNICIPAL COURT.

Argued September 12, 1994—Decided November 18, 1994.

*Patrick J. Monahan, Jr.,* Counsel, argued the cause on behalf of the Advisory Committee on Judicial Conduct.

*Leonard M. Bitterman* argued the cause for respondent.

PER CURIAM.

Respondent, Judge Philip A. Fenster, a municipal court judge, was charged with judicial misconduct. After hearing the matter, the Advisory Committee on Judicial Conduct recommended censure, finding that his conduct required a more severe sanction than public reprimand. We agree, but conclude that a suspension is warranted.

Respondent was charged with improperly permitting the Mayor of Paterson "to make a speech during a court proceeding." On August 9, 1991, respondent presided over a session of the Paterson Municipal Court. He had been a municipal court judge for seven years. One of the matters scheduled for that session was *State v. Martinez Brothers, Ricardo Martinez and Richard Martinez,* in which the defendants were charged with multiple housing violations in certain rental properties.

Shortly after the case commenced, the Mayor of the City of Paterson, apparently seated in the audience, interrupted the proceedings and asked if he might approach the bench. Respondent had previously learned that morning, before the proceedings started, that the Mayor was in the courtroom and wanted to speak or testify · in that matter. The Committee's opinion fairly describes and explains what then occurred:

Respondent asked defense counsel if he had an objection to the Mayor's speaking "seeing as how your clients sent a letter to the Mayor and, in fact, a tenant sent a letter to the Mayor." Respondent continued to express his own view of the propriety of the Mayor's speaking: "Since everyone has requested the Mayor's intervention, I think it's appropriate that he speak. Do you have any objections?"

Defense counsel asked to confer with his client and as he was doing so, Respondent observed:

Well, I think normally, it would be a valid objection because the Court has to be independent from the Mayor and the City. The Court is neutral between a defendant and the State or the City or the complainant. The Court has to be neutral and there is no reason for a mayor, or any person on City Counsel [sic] to appear. But I think this case is different.

In this case, both sides have written to the mayor requesting his intervention. Both sides. Not only one. It's not like one has said "Politically, I know the Mayor. I want the Mayor to influence the case." Both sides have written to the Mayor about this case and, in fact, have asked the Mayor to intervene.

Defense counsel replied that the Mayor's intervention had not been sought "in the judicial arena," but Respondent went on to say that it was good for people to write to the Mayor because the Mayor appoints the municipal judge and it helps the Mayor to know how someone is performing in his or her job. Respondent continued, noting that this was a case that was pending and concluding that the Mayor should be able to speak on the case because it had "been requested by both sides."

The individual defendants had not written to the Mayor to intervene in the proceedings but had copied him on a letter addressed to the Chief Justice. This letter dated July 10, 1991, was admitted into evidence before the Committee as Exhibit P-3. It was a long and detailed letter criticizing the Respondent's performance in the case. The Respondent's awareness of the contents of this letter and his initial reaction against the individual defendants at the onset of the proceedings strongly suggest that he was no longer impartial. This became clearer as the matter proceeded and defendants' counsel moved that Respondent recuse himself.

Defense counsel asked if the Mayor would be a fact witness. Respondent noted that the issue before the court was the question of an adjournment, and he stated: "Well, he [the Mayor] can argue as to whether the adjournment would be correct. He can argue about anything. Both sides have asked the Mayor to intervene." Defense counsel persisted in trying to pin the Respondent down to whether the

Mayor would be a fact witness or an expert witness. In response, Respondent asked the Mayor if he wanted to testify about whether the case should be adjourned. The Mayor replied that he would be sworn in, and Respondent observed that counsel could object if the Mayor said anything objectionable.

Defense counsel persisted and said: "Judge, but who is calling him? Is he here as a fact witness?" He continued: "Is he here as an expert witness? Is this going to be a political speech? What is this going to be?" Respondent insisted once again that both sides had asked the Mayor to intervene in the case and had sent letters to him. Once again, defense counsel observed that the Mayor's intervention had not been sought in the judicial proceeding. He also said that it would be very unusual to permit the Mayor to participate, and he told Respondent: "We may be treading on dangerous ground here if you let the Mayor talk at will and not being called as an expert witness."

Respondent stated again that both sides had written to the Mayor. Defense counsel replied: "Yes, but that still does not give him the right to come into court and make a political statement. I mean, this is a political speech now." Respondent replied: "Well, it very may well be (sic). But that's what both sides want, interference by a political person. Both sides wrote to the Mayor." Defense counsel replied: "Judge, if both sides wanted to turn this into kindergarten, you wouldn't permit it. Just because both sides wanted to do something inappropriate doesn't mean the Court has to permit it." Respondent agreed but once again said that the Mayor had been asked to intervene. He noted that counsel could object, and he maintained yet again that both sides had written to the Mayor.

Defendant Ricardo Martinez started to speak, and the prosecutor objected. Respondent observed that it was inappropriate for a client to argue, and he said that once the Mayor spoke anyone could answer. Defense counsel then returned once more to the question of who would be calling the Mayor as a witness. Respondent replied: "The court is calling him because everybody requested—" At that point, the municipal prosecutor finally spoke up and noted that views from the Mayor might well be considered to be analogous to a brief by an *amicus curiae*. He concluded that the Mayor should be permitted to speak, but defense counsel once again said: "Judge, we never requested the Mayor's intervention. I want to put that clearly on the record." Respondent insisted that defense counsel's "client sent a long detailed letter to the Mayor about this case, which I assume you know of because you got a copy of it." Defense counsel replied that that was true but that "we never requested the Mayor's judicial intervention."

Defense counsel returned to the question of who was going to call the Mayor as a witness. Respondent replied that both sides had written to the Mayor, and that the Mayor had come to court as "everyone asked him to do." Defense counsel responded: "Nobody asked him from our side." Respondent insisted that both sides had written to the Mayor telling him that there was a problem with the case. Respondent announced that he would permit the Mayor to speak, and he said that defense could object to anything the mayor said that was inappropriate. When defense counsel said that whatever the Mayor had to say should at least be in the form of questions and answers, Respondent added: "The Mayor is going to intervene. Instead of testifying for the State or for the—" Defense counsel asked

if there could be a proffer, and Respondent repeated that the Mayor was going to intervene and that defense counsel could object should the Mayor say anything objectionable. Respondent said that he was going to permit the Mayor to testify "as an amicus curiae, friend of the court, or intervener."

Defense counsel asked who would pose questions to the Mayor during his testimony, and Respondent answered that the Mayor would say whatever he wanted to say. Defense counsel then protested that there should have been a notice of motion to alert him to any participation of an amicus curiae, and Respondent replied: "Well, he's making a motion now and you oppose the motion. Is there anything else you want to say in opposition to the motion?" Defense counsel noted that the motion should have been made in writing so that he would not have been surprised. When Respondent noted that he. did not think the defense should be surprised "because you wrote a letter to the Mayor about this case," defense counsel observed that. his client had not written directly to the Mayor but had copied the Mayor on correspondence.

After additional colloquy, during which both Respondent and defense counsel repeated points that they had already made several times, and during which defense counsel expressed his view that "this highly irregular procedure will make things very much worse for everybody," the Mayor was sworn as a witness. He then made a statement in which he indicated that the defendants' tenants had had to put up with housing problems for eight months, and he said:

> I think it is absolutely shocking, the conditions that have been allowed and permitted on this property with the adjournments and the excuse that you're out of the country. Well, I'm not out of the country. And I'm here to seek justice and I hope, before I leave today, justice will be had so that these people over here, many of whom are nameless, know that their Mayor thinks that what they said is important.

The Mayor closed his statement by saying: "So I'm here, and I'm not leaving until justice is had today."

After the Mayor finished speaking, Respondent noted that the Mayor had commented not only on the question of adjournment but also on the evidence in the case. Respondent described the Mayor's comments in the latter regard as "sort of like an opening statement," and he said that the defendants would be found not guilty if there were no evidence they had violated the law. Defense counsel then began to argue that the trial was preempted by the fact that the defense had taken an appeal of the violation notices to the Construction Board of Appeals. The Mayor interrupted and said: "You question my appearance and yet we had to arrest your client to get him here. Now, you tell me am I smoking funny cigarettes or what? You tell me." Defense counsel objected to the Mayor's remarks, and the Mayor replied: "They stand."

Respondent then defended the Mayor, saying: "He has made these comments as a party to the actions hearing, pro se." He went on to pick up one of the themes of the Mayor's statement and chastised the defendant for failing to appear on previous occasions.

After testimony from certain witnesses, the Mayor addressed Respondent and requested permission to speak. Respondent gave him permission, and the Mayor

said: "Judge, justice delayed. One does not have to be a mental wizard to drive by this property. I'll be sworn again." Respondent said that the matter was now going to trial and he suggested that the Mayor testify as a fact witness at the trial.

Respondent then attempted to determine exactly what facts the defense had stipulated at prior proceedings in the case. After conferring with his client, defense counsel objected to what had already transpired in the courtroom: "With all due respect to the Court and to the Mayor and to all the people here, it is my opinion that this whole proceeding has degenerated into a circus-like atmosphere and the whole thing has already been staged and choreographed—" Respondent did not reply but returned to the question of stipulations. Defense counsel said that he did not think his client would receive a fair trial because the mayor had been called without his knowledge and because the courtroom was packed, many of those present being tenants of properties owned by the defendants.

Respondent then addressed defense counsel's objections to the presence of the Mayor:

Now, the fact that the Mayor is here, first of all, the Mayor appoints the Judge. So it's part of the Mayor's job to see how the Court is operating. It's the Mayor's appointment. So, in any case, the Mayor has the perfect right and an obligation to come and see how court runs. The Mayor makes the appointment.

Respondent continued in the same vein, indicating that the Mayor was only doing his job by going to court in view of the letter that he had received. Respondent also said that the Mayor had to appoint the judge and it was appropriate for him to see the court in operation after having gotten a letter critical of Respondent from defendant Martinez. Respondent concluded: "Not coming here on the part of the Mayor would be unfair both to the Court and to Mr. Martinez." Defendant's attorney noted that the Mayor could be present to observe the judge's performance without making speeches. Respondent then proceeded to justify the remarks that the Mayor had already made.

The defendant then moved for recusal, and Respondent denied that motion. Respondent also denied defense counsel's motion to be relieved and then denied the defendant's request to obtain another attorney. As the Mayor had urged earlier in the proceeding, Respondent refused to grant any adjournment and insisted that the trial proceed.

As defendant Richard Martinez was testifying, the Mayor spoke up and asked to make a point. He said that the defendant owned "a lot of properties in Paterson." Defense counsel objected. The mayor asked to complete his statement, and Respondent gave him permission. The mayor said: "Justice delayed is not justice." He continued, saying that there are many "absentee landlords who have attempted to speculate off the backs of the people of this city." He continued over the objections of defense counsel until Respondent said that the Mayor's remarks were relevant on the subject of sentencing should the defendant be found guilty.

After additional testimony by the defendant, the Mayor interrupted once again and said that he had "a personal matter I have to attend to." Respondent replied: "All right. Because I would like you to speak if you want. It's just that now really isn't the right time. But the Prosecutor can handle it." The Mayor replied: "I think the record is enough. He won't need me." Respondent said: "Alright.

You're welcome to speak if he is found guilty." The Mayor thanked Respondent and counsel and said: "The point is just the beginning. I intend to be back on other issues and in other cases so that landlords understand that they're not going to do what they've done for 30 years in this city. Period." With that promise of future intervention, the Mayor departed.

After additional testimony, Respondent made his decision. He found the defendant Martinez guilty but deferred sentencing. When delivering his decision, Respondent justified the remarks made by the Mayor and repeated the pretext on which he had relied in overruling objections of defense counsel: both parties had written to the Mayor asking him to intervene.

The Committee found that "[b]y insisting, over the objections of defense counsel, that the Mayor participate in the proceeding even though he was not an attorney and not called by either side as a witness, respondent unnecessarily and improperly injected politics into a court proceeding ..."; and that

By permitting the Mayor to make a speech that was both political in nature and prejudicial to the interests of the defendant and by sanctioning the Mayor's taking over the proceedings as if he were the judge, respondent created for those present the appearance that the municipal court was subject to the direction and control of the Mayor of the municipality.

The Committee found that this appearance was strengthened by the fact that Respondent's decisions in the case were exactly what the Mayor had argued for. It concluded that each of these aspects of Respondent's conduct violated Canons 1, 2A, and 7A(3) of the Code of Judicial Conduct and prejudiced the administration of justice by bringing the judicial office into disrepute. See *Rule* 2:15–8(a)(6).

The Committee's opinion continues as follows:

Four years ago, the Supreme Court publicly reprimanded two Judges of the Superior Court for attending the Inaugural Ball held in honor of the new Governor. In the accompanying statement on behalf of the Court, the Chief Justice observed:

There is no principle governing the judiciary in this state more firmly established or more important than the total separation of judges from politics. *See Clark v. De Fino,* 80 *N.J.* 539, 547 [404 *A.*2d 621] (1979); *In re Gaulkin,* 69 *N.J.* 185, 191 [351 *A.*2d 740] (1976); *In re Hayden,* 41 *N.J.* 443 [197 *A.*2d 353] (1964); *In re Pagliughi,* 39 *N.J.* 517 [189 *A.*2d 218] (1963). The principle is an essential ingredient of judicial independence; it is probably the most important requirement for maintaining public confidence in the judiciary. The rule is so clear, the tradition in this state so strong, that it is rarely violated. In New Jersey, judges and politics do not mix—not at all, either in fact or in appearance. 125 *N.J.L.J.* 243 (February 1, 1990).

In the present matter, Judge Fenster not only permitted the Mayor to speak in court about a case in which the Mayor was not properly a witness, but he overrode the objections of the attorney for the defendants in championing the appropriateness of the Mayor's doing so. The Mayor was not a witness in the case, and neither party sought to have him testify as a witness. When he spoke, what he had to say was political in nature, and he even suggested that he controlled the court by saying in his parting remark that he intended to return to court on other issues so that landlords would understand they could no longer get away with what they had gotten away with for years. Judge Fenster did nothing to correct the impression that the Mayor could control the court; rather, by urging the appropriateness of the Mayor's speaking, Judge Fenster reinforced this notion.

The Mayor had no business before the court. He was not a witness. He had no direct knowledge concerning the case in question. Indeed, had he been a witness in the case, venue would have been transferred to another municipality in order to avoid any appearance of impropriety. Under these circumstances, it is all the more improper for Respondent to have acted as he did in promoting the Mayor's appearance.

As the Chief Justice also observed in the above mentioned statement on behalf of the Supreme Court:

> The question is whether the public might believe the judge is somehow involved in politics or might have some doubt about whether the judge is totally and completely independent of politics, politicians, and political influence. In practice our application of the prohibition is almost harsh. The issue is not whether a reasonable person would probably conclude the judge had become vulnerable to political influence, but whether there is a fair possibility that some portion of the public might become concerned on that score. And, as in many other instances concerning the conduct of judges, the appearances count as much as the facts. *Id.*

Judge Fenster's conduct in this matter went far beyond what is necessary for "a fair possibility that some portion of the public might become concerned" that he would be vulnerable to political influence. Indeed, the only reasonable inference that can be drawn from his conduct and remarks regarding the Mayor's speaking, is that the Judge wanted to please the Mayor, who was his appointing authority as he mentioned more than once during the proceeding; at the formal hearing, Judge Fenster denied that this was his motive (T85–7 to 88–5), but the Committee does not believe him. This inference is unacceptable, as is the conduct that gave rise to it. What is worse is that what the Mayor eventually said was political in nature and implied that he was in a position not only to influence but to control the court. This undermines the principles of judicial independence and separation of powers.

## As noted above, the Committee concluded that

> Judge Fenster's conduct, in the face of the long standing prohibition against the intrusion of politics into the courtroom, requires a more severe sanction than public reprimand. The Committee respectfully submits that he should be censured.

We agree in all respects with the conclusions of the Committee except for the extent of discipline. Despite the Judge's fine

record, reputation, and service to the public, his conduct calls for more than censure, severe as that punishment is to any judge. It requires suspension. But for the absence of any direct benefit to the Judge and the absence of any evidence on this record of any complicity with the Mayor's conduct, removal would be required.

This Judge permitted the political independence of the judiciary to be destroyed in his courtroom, in open court. Over the strong objections of counsel, he knowingly and aggressively turned over the quasi-criminal proceedings before him to the Mayor, allowing him to speak under oath in favor of swift and severe punishment of the defendant and of all others in the future. The Judge did not even object to the Mayor's parting assurance that he would see to it that all future proceedings of this kind were handled by the court in accordance with the Mayor's notion of justice.

These proceedings involved a mayor, not a building inspector or other administrative official aiding in the prosecution of some code violation; a mayor, not just aiding the prosecution, but attempting to dictate the outcome; a mayor, the official who appoints the judge.

The Mayor's concerns with the municipal courts' handling of housing violations may have been justified, and if so, he had every right to make those concerns known. He had every right to deliver his message, including, if he saw fit, severe criticism of the court; he could announce it at a press conference, at a public gathering, at a meeting of the governing body, or at any other place and in any way designed to reach the public with the full impact that he may have sought to achieve. We seek no muting of public officials' criticism of the judiciary. But, although he apparently did not realize it, he had no right to take over a courtroom and to deliver that message as part of a pending quasi-criminal proceeding as a self-appointed "witness" and to imply that he was somehow going to control that court in the future. In this country, judges control the court; judges decide the case; not mayors or other public officials. Clearly, having taken his action in open court in full view of everyone, the Mayor did not believe that he was doing anything wrong; but for our purposes, that is

beside the point. Our concern is not with the Mayor but with the Judge. He permitted the conduct, he encouraged it, despite his clear duty to prohibit it, and he did so continuously over the strong objections of counsel, time and time again, during these relatively protracted proceedings.

The most persistent and serious threat to the excellence of our municipal courts has been the potential of political influence, a threat apparent from the experience of history, and arising from the institutional provisions of the court. Its judges have no tenure; their careers and livelihoods are dependent on the will of elected officials. Given those limitations, the extent of political independence of our municipal court judges has been an enormous accomplishment. The credit goes to the judiciary, and especially to the judges themselves, along with those mayors and other elected officials who have made it possible. Political independence was perhaps the most serious problem facing the judiciary in 1948 and one on which remarkable progress has been made. Its achievement has been a precious accomplishment for our citizens, and we will not allow it to be jeopardized in the least.

Clearly this judge's misconduct and culpability does not approach the venality of a clandestine "fix" in which a mayor decides the case through the mouth of the judge. But unless the message of condemnation is unmistakable, the potential damage is profound. We will not allow the political independence of the municipal courts to be affected even slightly by speculation about how much a judge may do to accommodate the political, social, or legislative agenda of the mayor, whether that agenda be evil or benign. In his or her judicial role, the judge may do so not at all, not in the least, never. There is nothing more important to the judiciary than its independence, especially its independence from political influence. That truth resonates throughout the judiciary, but nowhere more than in the municipal courts.

Judge Fenster is suspended without pay for a period of six months, effective immediately.

So ordered.

*For Suspension*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

### ORDER

JUDGE PHILIP A. FENSTER of the Paterson Municipal Court having been Ordered to Show Cause why he should not be publicly disciplined for violations of Canons 1, 2A, and 7A(3) of the *Code of Judicial Conduct* and *Rule* 2:15–8(a)(6);

And the Court having reviewed the record and having considered the arguments of counsel;

And good cause appearing;

IT IS ORDERED that JUDGE PHILIP A. FENSTER is suspended without pay for six months, effective immediately; and it is further

ORDERED that pursuant to *N.J.S.A.* 2B:12–6 and *Rule* 1:12–3, the Assignment Judge of Passaic County shall appoint an acting judge to serve in the Paterson Municipal Court during respondent's suspension or until such time as the municipality appoints a judge pursuant to *N.J.S.A.* 2B:12–5(a)(2) or *N.J.S.A.* 2B:12–4.