998 A.2d 949

IN THE MATTER OF PHILIP N. BOGGIA, JUDGE
OF THE MUNICIPAL COURT.

Argued September 15, 2009—Decided July 27, 2010.

*Candace Moody* argued the cause on behalf of the presenter, Advisory Committee on Judicial Conduct.

*Robert E. Ramsey* argued the cause for respondent (*Donini & Ramsey,* attorneys).

*Richard H. Steen,* President–Elect, submitted a brief on behalf of amicus curiae New Jersey State Bar Association.

*Roy F. McGeady,* Presiding Judge Municipal Court, submitted a brief on behalf of amicus curiae Conference of Presiding Judges—Municipal Court.

Chief Justice RABNER delivered the opinion of the Court.

This case involves a part-time municipal court judge whose law partner made political contributions from the firm's joint business account. The Advisory Committee on Judicial Conduct (ACJC) found that the conduct violated Canon 7 A(4) of the *Code of Judicial Conduct* as well as two court rules and recommended that the judge be publicly admonished.

Because the manner in which the contributions were made created an appearance that a judicial officer was involved in politics, we believe that the line separating judges and politics was crossed. That issue raises concerns that can be found at law firms of all sizes. Political contributions made out of a firm's business account by a partner or associate of a municipal court judge, whether at a two-person firm or a far larger one, create an appearance of political involvement that must be avoided. To that end, we now attempt to clarify the principle for part-time judges and lawyers alike, and we refer the matter to two Court committees for the development of appropriate rules.

Among other changes, the *Rules of Professional Conduct* (RPCs) should be amended to ensure that attorneys who practice law with part-time municipal judges are likewise barred from making political contributions from a firm's business account. Lawyers, though, may continue to make political contributions using their personal funds.

In light of the unique facts before us, which have not previously been considered by this Court, we do not find that Canon 7 A(4) was violated and therefore do not impose any discipline in this case. Faced with similar facts in the future, however, the rule we announce today would require a different outcome.

## I.

Respondent Philip N. Boggia was admitted to practice law in New Jersey in 1978. He began practicing with Martin T. Durkin, Esquire. Three years later, in 1981, the two established the law firm of Durkin & Boggia (the "Firm"). The Firm operates as a general partnership, and both lawyers remain the Firm's sole partners. Since January 30, 2004, respondent has also served as a part-time municipal court judge for the Borough of Moonachie.

On December 10, 2007, a member of the public filed a complaint with the ACJC alleging that respondent had made political contributions. Attached to the complaint were records of the Edgewater Democratic Campaign Fund, which reported three contribu-

tions from "Durkin & Boggia," from June 2004 to July 2005, totaling $1600. The complaint also included records from the Election Law Enforcement Commission (ELEC) listing a $600 contribution by "Philip N. Boggia" to the Bergen County Democratic Organization in January 2005.

The ACJC filed a formal complaint against respondent on January 5, 2009, alleging that he violated Canon 7 A(4) of the *Code of Judicial Conduct,* as well as *Rules* 2:15–8(a)(5) and (6) of the *New Jersey Court Rules,* when the Firm made political contributions. Specifically, the formal complaint referenced two $500 contributions by the Firm to the Edgewater Democratic Campaign Fund, on May 26, 2004 and September 29, 2004, and a third $500 contribution to the Bergen County Democratic Organization on January 12, 2005, all signed by Martin Durkin. (The record discloses that the third check was actually in the amount of $600.) The complaint does not mention an additional check that the citizen highlighted—a $600 contribution received by the Edgewater Democratic Campaign Fund on May 18, 2005—but the parties later stipulated to the admission of that evidence.

The checks were all drawn on the "ATTORNEY BUSINESS ACCOUNT" for "DURKIN & BOGGIA." That information appears on the upper-left portion of each check.

The ACJC conducted a formal hearing on March 26, 2009, at which time respondent testified and the parties submitted joint stipulations. Respondent said that he was unaware of the contribution checks signed by his partner until he learned of them via the ACJC. Although he had made political contributions as an attorney and knew of the Firm's practice of doing so before January 30, 2004, respondent testified that he understood he "was no longer allowed to be involved in politics" and "not allowed to make political contributions" as a judge. As a result, he testified that when he became a judge, he gave oral instructions to his law partner and office staff to stop making political donations from the Firm's joint business account.

Respondent's partner submitted a certification in which he stated that the contributions "were drawn on … the law firm's checking account by mistake and it was due to an inadvertence on my part." After learning of the four checks, respondent testified that he reminded his partner not to make any more contributions out of the Firm's account. In his own words, respondent explained, "I didn't think it was the appropriate thing to do. I didn't think our firm should be making political contributions while I was a judge." When asked if he could appreciate the appearance created when Firm checks were paid to political organizations, respondent replied, "[a]bsolutely…. [I]t's not lost on me at all."

Respondent did not know whether the political contributions were attributable to his partner's draw or treated as an expense of the law partnership. If they were considered an office expense, then respondent in effect funded a portion of the contributions, because he was the only other partner in the Firm.

After the hearing, the ACJC issued a Presentment and found by clear and convincing evidence that respondent violated Canon 7 A(4) of the *Code of Judicial Conduct* and *Rules* 2:15–8(a)(5) and (6). The ACJC wrote,

> It is uncontested in this matter that the four political contributions in question were attributed to the law firm of "Durkin & Boggia." It is similarly uncontested that the monies donated were drawn from the Firm's joint business account. The actual issued checks reflect "Durkin & Boggia" as the payor. Respondent is one of only two partners in the Firm, and his last name is featured in the Firm's name. Under these facts, Respondent cannot avoid responsibility for the contributions at issue by simply indicating that he was not aware of them. Even if Respondent did not possess actual knowledge of the various political donations made, we find that the appearance was created that he, with his law partner, were responsible for the political contributions. That appearance is strictly prohibited under the *Code of Judicial Conduct* as well as binding case law.
>
> [ (Internal citations omitted).]

The ACJC rejected respondent's argument that he was being held vicariously liable for his partner's actions. Rather, its findings were based on the "undeniable appearance that Respondent shared responsibility for the contributions." The ACJC therefore recommended that respondent be publicly admonished.

We issued an Order to Show Cause on June 1, 2009.

## II.

The designated presenter for the ACJC reiterates the principles and findings in the Presentment. Echoing that document, she argues that part-time municipal court judges are absolutely barred from political involvement, either in appearance or reality, and that the Firm's political contributions raise questions about respondent's susceptibility to political influence.

Respondent concedes that he is barred from engaging in political activity as a judge. But he contends that, under the case law, the prohibition requires some purposeful, knowing, or reckless conduct on his part. Instead, he argues that he is being held vicariously liable for his partner's acts. He submits that a strict liability standard would effectively ban part-time municipal judges from employment at firms that make political contributions. In that context, he also alludes to First Amendment concerns. Alternatively, he recommends that the court rules be modified to ban firms that employ part-time judges from making political contributions only in the county where a part-time judge sits.

We asked the Conference of Presiding Judges—Municipal Courts (Conference) and the New Jersey State Bar Association (NJSBA) to participate as amici curiae.

The Conference maintains that respondent's conduct did not violate the *Code of Judicial Conduct* because his actions were not marked by moral turpitude. As a result, it argues that no discipline is warranted. In addition, the Conference submits that the ACJC's strict approach would make it difficult for any firm to employ a part-time municipal court judge.

The NJSBA argues in favor of a strict, bright-line rule barring both actual and apparent political participation by judges. In this case, the NJSBA maintains, the checks clearly gave the impression that respondent either made or influenced the contributions. The NJSBA contends that all firms have the capacity to disallow

political contributions from a business account, and that judges can take precautionary steps to monitor compliance with that standard.

### III.

We have come a long way since the days under the 1844 Constitution when "it was not considered unethical for a judge ... to participate rather directly in the political process, at least to the extent of making campaign speeches and contributions." *In re Gaulkin*, 69 *N.J.* 185, 192, 351 *A.*2d 740 (1976). The 1947 Constitution marked a stark change by ensuring the "complete separation of politics from the judiciary." *In re Randolph*, 101 *N.J.* 425, 427, 502 *A.*2d 533 (1986). Since then, this Court has consistently upheld that principle. *See In re Fenster*, 138 *N.J.* 134, 143, 649 *A.*2d 393 (1994); *Clark v. DeFino*, 80 *N.J.* 539, 547, 404 *A.*2d 621 (1979); *In re Gaulkin, supra*, 69 *N.J.* at 191, 351 *A.*2d 740; *In re Hayden*, 41 *N.J.* 443, 445, 197 *A.*2d 353 (1964); *In re Pagliughi*, 39 *N.J.* 517, 523, 189 *A.*2d 218 (1963); *see also January 29, 1990, Public Statement by Chief Justice Wilentz on Behalf of the New Jersey Supreme Court*, 125 *N.J.L.J.* 243 (Feb. 1, 1990) (*Jan. 29, 1990, Public Statement by Chief Justice Wilentz* ). The reasons for an absolute approach are clear: to ensure that the judicial branch operates independently of political influence and, consequently, to maintain public confidence in the integrity and impartiality of our system of justice.

The possibility of political influence is especially great in the municipal courts. *See In re Fenster, supra*, 138 *N.J.* at 143, 649 *A.*2d 393. Municipal judges are appointed by the mayor or local governing body for a term of three years. *N.J.S.A.* 2B:12–4(b). The overwhelming majority of judges who serve the public not only with excellence but also in an independent manner are a credit to that system. Nonetheless, the need to detach municipal court judges from politics remains patent.

To be sure, the rule separating politics and judges is not a criticism of the political process. *In re Gaulkin, supra*, 69 *N.J.* at

192, 351 *A*.2d 740; *In re Pagliughi, supra,* 39 *N.J.* at 522–23, 189 *A*.2d 218. It is simply a necessary standard for how individuals must conduct themselves if they are privileged to become part of the Judiciary.

Longstanding ethical principles provide guidance to judges in that regard. In 1959, Chief Justice Weintraub addressed "requests to members of the judiciary for contributions to political parties." Letter from Chief Justice Weintraub to All Members of the Judiciary 1 (July 13, 1959) (on file with the New Jersey State Library). Referring to then-Canon 28 of the *Canons of Judicial Ethics,* which barred judges from "making political speeches [and] making or soliciting payment of assessments or contributions to party funds," he emphasized that political contributions are prohibited. *Ibid.* He explained that "experience has demonstrated that the independence and integrity of the judiciary are best served by total divorcement from the political scene. The Canon accepts that thesis, and is binding upon each of us." *Id.* at 2.

The current rules provide similar direction and limitations. Judges are "to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." *Code of Judicial Conduct,* Canon 2(A). Canon 7 A(4) speaks more directly to the facts of this case: "A judge shall not ... solicit funds for or pay an assessment or make a contribution to a political organization or candidate, or purchase tickets for political party dinners or other functions." *See also R.* 1:17–1(a) (barring judges from holding elective public office or engaging in "partisan political activity"); *R.* 1:17–2 (barring judges from non-partisan political activity).

Our rules also require that judges "must avoid all impropriety *and* appearance of impropriety." *Code of Judicial Conduct,* commentary on Canon 2 (emphasis added); *see State v. McCabe,* 201 *N.J.* 34, 42–43, 987 *A*.2d 567 (2010); *DeNike v. Cupo,* 196 *N.J.* 502, 514, 958 *A*.2d 446 (2008). " '[J]ustice must satisfy the appearance of justice.' " *State v. Deutsch,* 34 *N.J.* 190, 206, 168 *A*.2d 12 (1961) (quoting *Offutt v. United States,* 348 *U.S.* 11, 14, 75

*S.Ct.* 11, 13, 99 *L.Ed.* 11, 16 (1954)); *see also In re Blackman,* 124 *N.J.* 547, 551, 591 *A.*2d 1339 (1991) ("Improper conduct includes creating or acquiescing in any appearance of impropriety.").

Under *Rule* 2:15–8(a), the ACJC is directed to review any grievance that alleges a municipal court judge "is guilty of . . . (5) engaging in partisan politics, or (6) conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

■ We construe the rules governing judicial conduct broadly, consistent with "their purpose of maintaining public confidence in the judicial system." *In re Blackman, supra,* 124 *N.J.* at 554, 591 *A.*2d 1339.

## IV.

■ We next apply the above principles to the facts of this case. Several facts stand out in our analysis: multiple political contributions were drawn on the business account of "Durkin & Boggia"; the Firm's name appears in capital letters on the checks as the payor; and respondent is a named partner of the firm, whose last name appears on the checks. In addition, publicly available records of the political contributions attributed them to "Durkin & Boggia," and to respondent himself in one mistaken instance. Furthermore, even respondent could not say whether the contributions were treated as part of his partner's draw or as an expense of the law partnership which he would have funded.

■ Those facts present a close case as to whether respondent violated Canon 7 A(4) of the *Code of Judicial Conduct.* As the ACJC concluded, the circumstances create an undeniable appearance that respondent shared responsibility for the contributions. They also raise questions about his vulnerability to political influence.[1]

---

[1] The ACJC considered the facts in light of the following standard: "[W]hether there is a fair possibility that some portion of the public might become con-

To be sure, judges must take adequate steps, to the best of their ability, to avoid an appearance of impropriety. Here, respondent was fully aware of the Firm's prior practice of making political contributions. He was also one of only two partners in a small law firm and had full access to all of the Firm's financial records. Only four people, including respondent, had the authority to write checks on the business account.

When respondent became a judge, he took on an "implicit burden" to be "vigilant in detecting possible impropriety" as well as the appearance of impropriety. *In re Gaulkin, supra,* 69 *N.J.* at 198–99, 351 *A.2d* 740. In this context, that duty required that he take sufficient measures, to the best of his ability, to ensure that the Firm no longer made political contributions. To that end, respondent orally instructed his partner and staff not to issue any more political contributions. But according to the record, he took

cerned" that "the judge had become vulnerable to political influence." *Jan. 29, 1990, Public Statement by Chief Justice Wilentz, supra,* 125 *N.J.L.J.* at 243. The Conference recommends that we apply the standard for recusal announced in *DeNike* and *McCabe:* "Would a reasonable, fully informed person have doubts about the judge's impartiality" or vulnerability to political influence? *McCabe, supra,* 201 *N.J.* at 43, 987 *A.2d* 567; *DeNike, supra,* 196 *N.J.* at 517, 958 *A.2d* 446. Under either standard, we do not find that Canon 7 A(4) of the *Code of Judicial Conduct* has been violated for reasons set forth below.

We also do not find a violation of *Rules* 2:15-8(a)(5) or (6). *Rule* 2:15-8 outlines the process to be followed by the ACJC and the scope of its jurisdiction. Section (a) lists six areas that the Committee may investigate, which in many respects parallel the categories of misconduct set forth in the canons of the *Code of Judicial Conduct.* Nonetheless, *Rule* 2:15-8 does not provide alternative, substantive standards of conduct for judges to follow. Those standards can instead be found in the *Code of Judicial Conduct,* the *Rules of Professional Conduct,* and certain other rules. *See, e.g., R.* 1:18 ("It shall be the duty of every judge to abide by and to enforce the provisions of the *Rules of Professional Conduct,* the *Code of Judicial Conduct* and the provisions of *R.* 1:15 [ (limiting practice of law) ] and *R.* 1:17 [ (limiting political activity) ].").

We recognize that language in certain prior cases, *see, e.g., In re Subryan,* 187 *N.J.* 139, 153, 900 *A.2d* 809 (2006); *In re Mathesius,* 188 *N.J.* 496, 520, 910 *A.2d* 594 (2006), could lead to an alternative view and therefore direct that, going forward, *Rule* 2:15-8 not be used as a basis for a substantive ethical violation.

no additional steps and did not monitor whether his request was followed.

Law firms routinely perform conflicts checks when they evaluate new clients. As the NJSBA reports, similar arrangements can be made to disallow political contributions and periodically check for them. To avoid the appearance of impropriety, judges and firms must fashion appropriate measures to stay away from what occurred here.

That said, however, we recognize that respondent took some steps to try to avoid what happened, which in the end were ineffective. He also argues that Canon 7 A(4) has not previously been applied to facts like those now before the Court. In addition, his law partner acknowledges that he was responsible for all of the political contributions made.

In order to sustain a charge against a judge, the allegation must be proven by clear and convincing evidence. *R.* 2:15–15(a). Given the nature of the facts in this case, we cannot find that that standard was met. Also, to the extent there was any lack of clarity in the law, we decline to find a violation of Canon 7 A(4) in this matter and try to provide guidance to part-time municipal court judges going forward. *See In re Blackman, supra,* 124 *N.J.* at 556, 591 *A.*2d 1339 (imposing no discipline for municipal court judge's violation of court rule "because of the uncertainty of the Rule's meaning and application prior to this opinion").

## V.

Prior case law informs our approach. In *In re Gaulkin,* this Court addressed similar concerns raised by the use of marital assets of a judge and spouse. Noting that both spouses contribute to joint familial assets, this Court announced that it "would regard the use of any part thereof in the political forum as degrading to the court and plainly within the reach of the adjuration that the judge abstain from politics." *Id.* at 199, 351 *A.*2d 740. Spouses of a judge can only contribute to political causes "out of private and separate assets or income." *Id.* at 200 n. 7, 351 *A.*2d 740. Such a

strict approach was necessary because marital "assets normally are marked by a lack of an identifiable interest of either spouse, thus at least suggesting indirect involvement of the judge." *Id.* at 199–200, 351 *A.*2d 740. Similarly, as this case demonstrates, political contributions from a law partnership's business account cannot always be readily identified with a single member of a firm and can suggest a judge's direct involvement in politics.

In New York, to avoid an appearance of impropriety, advisory ethics opinions ban law firms from making political contributions in the name of a firm that employs a part-time judge. *See* N.Y. Adv. Comm. on Jud. Ethics, Op. 96–29 (1996) ("The judge's law firm's checking account should not be used to make political contributions even where the judge is not the signatory on the check. The judge cannot do indirectly that which is forbidden explicitly."); N.Y. Adv. Comm. on Jud. Ethics, Op. 88–56 (1988). In the latter case cited, the advisory opinion explained,

> When a law firm, whose members include a part-time judge, donates money to a political campaign, it is correctly presumed that a percentage of the donation comes from the judge. If the judge is an associate or a partner of the firm, such donations give the clear appearance that the judge has endorsed the donee's candidacy. Such contributions, therefore, may not be made in the firm name. [Op. 88–56, *supra.*]

*See also In re DeVaul,* N.Y. State Comm'n on Jud. Conduct (Mar. 22, 1985) (finding judge violated rule prohibiting contributions to political campaign when judge's law firm, in which he had one-quarter interest, made seven contributions to political campaigns).

█ For like reasons, contributions by one partner in a two-partner firm can readily run afoul of the ban separating judges and politics in this State. But the concerns raised by this case extend well beyond two-lawyer firms. Notwithstanding whether a lawyer's name appears on the masthead, or if he or she is a partner, shareholder, director, of counsel, or associate (or holds some comparable status), or if post-event accounting adjustments to income can be made, the appearance of impropriety that we have identified is present in all of those situations. For that reason, the ban on making political contributions from a law firm's business account must apply not only to part-time municipal

judges themselves but to the lawyers with whom they practice law and the firms where they do so. A fair rule must apply with equal force to a two-person partnership and a large firm.

We refer this matter to the Professional Responsibility Rules Committee and the Advisory Committee on Extrajudicial Activity and ask them to develop appropriate rules to implement today's decision. Among other things, we ask them to recommend changes to the *RPCs* to ensure compliance by part-time judges as well as other lawyers in their respective firms. It would be untenable to require that part-time judges undertake efforts to prevent colleagues at a firm from making political contributions, only to be overridden by a partner with a contrary view.

## VI.

We need not address respondent's allusion to the First Amendment in light of the disposition of his case. In any event, we agree with the ACJC's analysis of that issue. Law partners of municipal court judges remain free to exercise their First Amendment rights by contributing to political causes as individuals. To be clear, this opinion addresses contributions from a law firm's business account, not a partner's personal funds. From a practical standpoint, this approach may be somewhat more burdensome for a part-time judge's partners and associates. *Cf. In re Gaulkin, supra,* 69 *N.J.* at 199, 351 *A.*2d 740 (noting that for spouses of judges, "certain amenities of life, and perhaps even some legal rights, have to be sacrificed or curtailed for the larger purpose of avoiding the fact or appearance of participation by the judge in the political effort of a spouse"). But we are plainly not limiting the First Amendment rights of attorneys who practice law with part-time municipal judges because those lawyers may continue to make personal political contributions.

## VII.

For the reasons set forth above, we do not find that Canon 7 A(4) was violated in this case. We also refer the larger issue to two Committees for further action consistent with this opinion.

The proper backdrop for the Committees' efforts should be the overriding need to keep politics and the judiciary separate. That is essential to uphold the independence of the judiciary and to maintain public confidence in our courts. An appearance of impropriety generated by political contributions can diminish both core aims.

*For Presentment Dismissal*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.

## ORDER

The Advisory Committee on Judicial Conduct having filed with the Court a presentment recommending that **PHILIP N. BOG-GIA,** a Judge of the Municipal Court of the Borough of Moona-chie, be publicly reprimanded;

And the Court having issued an Order to Show Cause and having reviewed the record and heard the arguments of counsel;

And the Court having determined that the charges against respondent have not been established by clear and convincing evidence and that respondent should not be disciplined;

And good cause appearing;

It is ORDERED that the Presentment is hereby dismissed.