900 A.2d 809

IN THE MATTER OF RANDOLPH M. SUBRYAN, A JUDGE OF THE SUPERIOR COURT OF NEW JERSEY.

Argued February 1, 2005—Decided June 29, 2006.

140

*Patrick J. Monahan, Jr.,* Counsel, argued the cause on behalf of the Advisory Committee on Judicial Conduct.

*Justin P. Walder,* argued the cause for respondent (*Walder, Hayden & Brogan,* attorneys; *Mr. Walder* and *Steven D. Grossman,* on the brief).

Chief Justice PORITZ delivered the opinion of the Court.

A formal complaint in this matter was filed with the Advisory Committee on Judicial Conduct (ACJC or Committee) on March 17, 2004, by the Secretary to the Committee, wherein it was alleged that Superior Court Judge Randolph M. Subryan engaged in "a pattern of improper conduct toward [his law clerk,] J.B.[1] that culminated in his kissing her against her will on May 30, 2003." Based on that pattern (inappropriate comments to J.B. and other law clerks, "touching J.B. on the shoulders, and ... kissing J.B."), the Complaint charged Judge Subryan with violations of the Canons of the *Code of Judicial Conduct*, specifically Canon 1 (requiring a judge to "personally" conduct himself or herself according to "high standards of conduct so that the integrity and independence of the judiciary may be preserved"); Canon 2A (requiring a judge to "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary"); and *Rule* 2:15–8(a)(6) ("conduct prejudicial to the administration of justice that brings the judicial office into disrepute").

After five days of hearings and the submission of numerous exhibits and summation briefs, the Committee filed a Superseding Presentment (Presentment)[2] recommending censure of Judge Subryan for violations of the above-mentioned Canons and *Rule*. The ACJC found clear and convincing evidence that Judge Subryan had "made an unwanted advance to [his law clerk] J.B. on May 30, 2003," in a manner that denigrated his judicial office and lessened "public confidence in the integrity and impartiality of the

---

[1] Although J.B.'s name is known to the public because of the publicity surrounding this matter and because she filed a civil lawsuit against Judge Subryan and the judiciary, we will maintain our practice of using initials to designate the complainant. We note that J.B.'s civil action was settled, without admission of fault, on February 9, 2006.

[2] On November 15, 2004, the ACJC issued a Presentment that was recalled after consideration of new evidence put forward by respondent. The Superseding Presentment was filed with the Court on December 6, 2004.

judiciary." Although, as noted, the complaint before the ACJC had alleged a "pattern of improper conduct" by the judge that "created an atmosphere of permissiveness," the Committee found that that claim was "not supported by clear and convincing evidence sufficient to constitute judicial misconduct."

After receipt of the Presentment, the Court issued an Order to Show Cause why respondent "should not be publicly disciplined through the imposition of an appropriate sanction that does not include removal from judicial office," and set the matter down for oral argument. Having considered the arguments of counsel and having independently reviewed the record before us, we now adopt, with certain exceptions noted herein, the ACJC's findings in respect of respondent's conduct. We conclude that inappropriate comments and physical contact initiated by the judge occurred in chambers during the months prior to May 30, 2003, but that those interactions, although improper in the courthouse setting, did not rise to the level of judicial misconduct by respondent. We further find, however, that respondent's unwanted overture to J.B. on May 30, 2003, violated both the Canons and *Rule* 2:15–8(a)(6).

## I.

When the ACJC recommends that a judge be disciplined by the Supreme Court, the Committee has determined that the charges against the judge were proven by clear and convincing evidence. *R.* 2:15–15(a); *In re Seaman,* 133 *N.J.* 67, 74, 627 *A.*2d 106 (1993).

> Clear and convincing evidence ... "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established"[; it is] evidence "so clear, direct and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy, of the precise facts in issue."
>
> [*Ibid.* (first and third alterations in original) (citation omitted).]

Moreover, "[e]vidence may be uncontroverted, and yet not be clear and convincing," or conversely, evidence may be contested and contradictory and yet be clear and convincing. *In re Jobes,* 108 *N.J.* 394, 408, 529 *A.*2d 434 (1987) (citations omitted).

The Court reviews a disciplinary matter presented by the ACJC *de novo* under the same standard of proof. *In re Williams,* 169 *N.J.* 264, 271, 777 *A.2d* 323 (2001). In our evaluation of the record, we independently consider " 'whether the facts ... demonstrate conduct ... that is incompatible with' the canons of judicial conduct." *Ibid.* (quoting *Seaman, supra,* 133 *N.J.* at 75, 627 *A.*2d 106). "A *de novo* hearing provides a reviewing court with the opportunity to consider the matter 'anew, afresh [and] for a second time.' " *In re Phillips,* 117 *N.J.* 567, 578, 569 *A.2d* 807 (1990) (quoting *Romanowski v. Brick Twp.,* 185 *N.J.Super.* 197, 204, 447 *A.*2d 1352 (Law Div.1982), *aff'd o.b.,* 192 *N.J.Super.* 79, 469 *A.*2d 85 (App.Div.1983)).

> Although a court conducting a *de novo* review must give due deference to the conclusions drawn by the original tribunal regarding credibility, those initial findings are not controlling. *State v. Johnson,* [ ] 42 *N.J.* [146,] 157 [(1964)]. On reviewing the record *de novo,* the court must only make reasonable conclusions based on a thorough review of the record. That process might include rejecting [or accepting] the findings of the original tribunal, which are necessarily based on an assessment of the demeanor and credibility of witnesses.
>
> [*Phillips, supra,* 117 *N.J.* at 579–80, 569 *A.*2d 807.]

This case involves contradictory versions of the facts in respect of the interactions in respondent's chambers and the incident of May 30, 2003.

## II.

### A.

On *de novo* review of J.B.'s allegations, we find that the evidence is both clear and convincing that there was an "atmosphere of permissiveness" that included improper conduct by respondent in chambers during the period of J.B.'s clerkship. Despite relatively minor differences in the statements of various persons who were present over the course of the year, including the judge, secretaries, law clerks and lawyers, and despite some disparity in the way different people interpreted the behavior of others, a consistent picture of what occurred is evident from the testimony.

## B.

Respondent hired J.B. to be his law clerk for a one-year term commencing in September 2002, and concluding at the end of August 2003. During the fall and winter of the clerkship, J.B. and respondent had a friendly but professional relationship that included attending legal functions after work and, on occasion, having lunch at restaurants frequented by other courthouse personnel. By J.B.'s own account, she and respondent worked well together and she viewed him as a mentor to her and to other clerks who would come to his courtroom to listen and to learn. Lighthearted bantering and affectionate behaviors were common in respondent's chambers; indeed the ACJC found, and we concur, that "kisses on the cheek, hugs, touching on shoulders, and the like, [were] tolerated and accepted, if not encouraged. . . ."

People apparently visited the judge's chambers because of the pleasant and friendly atmosphere although, at times, the banter was gender-related or had sexual implications. The judge acknowledged repeating a "joke" to the effect that women under eighteen are protected by law and women over thirty-five are protected by nature. Other examples include jokes about "blondes" and a comment by respondent to J.B. that she would be an old maid with twenty cats. When two clerks claimed that they were haunted in their dreams by their judges who were complaining about them, respondent asked J.B. whether he haunted her too, and when an assistant prosecutor sent a picture postcard of a "buxom" woman in a bikini to respondent, the postcard was left on respondent's desk where it could be seen. Although no one else was present, J.B. was credible when she described a conversation with the judge in which he criticized a couple having an affair, not because of their conduct but because they were "indiscrete" in the way they conducted themselves.

In a more serious vein, more than one person heard the judge say that a woman lawyer who tried cases in his court was "hot" and that he might rule in her favor for that reason. J.B. also testified that respondent told her she would "turn [him] into Judge

Seaman." [3]   When questioned about his comment, respondent
claimed never to have heard of Judge Seaman, a claim we find
incredible.   The Court's opinion in *Seaman* was issued on July 16,
1993, approximately five months after respondent's appointment to
the bench and four months before his first participation in the
Judicial College, the judiciary's annual three-day education confer-
ence.   The case attracted significant public attention at the time
and sexual harassment training was provided in every vicinage for
judges and staff alike.

There was also substantial testimony about the gossip in the
courthouse when sexually explicit photographs were offered in
evidence during a highly publicized criminal trial before respon-
dent.   J.B. and other law clerks stated that respondent attempted
to show J.B. the photographs and that she told him she had no
desire to see them.[4]   Respondent himself told the Committee that
one of the clerks "asked to see the photographs, and I said no.   I
believe I said my clerk doesn't want—hasn't seen them, why
should you see them."   He acknowledged telling the clerk that she
was "too young."   There was additional credible testimony from
several witnesses that the judge joked about the photographs, and
that he said the law clerks were "too young and innocent" to see
them.   Two of the clerks stated that respondent described one of
the "milder" photographs to them in his chambers in J.B.'s
presence.   No one, including respondent, seemed concerned about
whether the discussion was offensive to anyone who was there.

■   In our view, the question is not whether there is clear and
convincing evidence that the judge and others made comments
and jokes in chambers about gender and sex, and even about
pornographic pictures—there is ample evidence they did.   The

---

[3] Judge Seaman was disciplined by the Court for sexual harassment of his law
clerk.   *In re Seaman,* 133 *N.J.* 67, 627 *A.2d* 106 (1993).

[4] Whether the judge actually had the photographs in his possession outside of
the courtroom is contested.   That question is irrelevant to the conversations
discussed in this opinion.

question is whether those comments and jokes violated the *Code of Judicial Conduct.* Although the issue is closely poised, we find that they did not. The record suggests that the people who participated in the banter believed it to be harmless. Because of the possibility that some of those present could be offended, however, jokes and comments about gender and sex are simply not appropriate in this setting. A judge always must maintain a dignified environment, whether in the courtroom or in the relative informality and privacy of his or her chambers.

## C.

We turn now to J.B.'s allegation that respondent kissed her against her will. The testimony indicates that sometime in April 2003, the relationship between respondent and J.B. began to deteriorate. J.B. claims that she sensed a change in respondent who made suggestive comments she found "bizarre." Other witnesses corroborated J.B.'s testimony that the judge placed his hands on her shoulders and a fellow clerk confirmed J.B.'s allegation that he "rubbed" her shoulders. That clerk thought the judge's conduct was improper.

No one witnessed the interaction between J.B. and respondent on May 30, 2003. The door to the judge's office was closed and only J.B. and the judge were present. We therefore are confronted with respondent's version of what happened and his law clerk's version of what happened. In certain respects their stories are the same; yet, on the core issue before the Court, whether the judge made an unwanted advance toward his clerk, the divergence is stark. We agree with the ACJC that J.B.'s description of her interaction with respondent is credible and that her subsequent behavior supports her claim.

Prior to May 30, J.B. had interviewed for a position with a New York (Long Island) based firm. She had been called back for a second interview on Monday, June 2, and sought advice from respondent beforehand. She was concerned about the position, which included supervisory responsibilities, and worried that she

had not asked for a salary commensurate with those responsibilities. On the afternoon of May 30, J.B. discussed the issue with respondent but, because she remained uncertain about what she should do, at about 4:30 p.m. when respondent was leaving for the day, she asked to talk to him once again. The ACJC Presentment describes what happened after that.

J.B. and Respondent entered chambers, and Respondent closed the door. J.B. considered that "weird." She asked Respondent what she could say at the interview to get a higher salary. Respondent told J.B. that she had no experience and really could not seek a higher salary. He went on to add that J.B. had a bigger problem in that the firm wanted her to start soon and she needed his "blessing" to leave before the end of her clerkship. He added that she would have a bad mark on her record if she did not have his "blessing" when she left.

J.B. asked Respondent why she should care about a bad mark in Trenton inasmuch as she was returning to New York to practice. Respondent replied that the mark would follow her. He asked J.B. what it was worth to her, and she said it was worth nothing because she was not sure she wanted the job for which she was about to interview because it would entail a lengthy commute to and from Long Island. Respondent asked again how much it was worth to her, and J.B. jokingly asked if Respondent wanted her to stay for her full term or if he wanted her to stay forever.

Respondent then asked J.B. if she wanted to stay there forever. He then became very serious. His attitude changed completely. It was no longer light and joking. He asked again if J.B. wanted to stay there forever, and she replied that she could not because she could not afford to. Respondent repeated his question and then asked once again how much it was worth to her. J.B. replied it was worth nothing to her.

Respondent told J.B.: "You and your boundaries, that's all that's been saving you." After a further exchange about boundaries and reference to another law clerk, Respondent started to approach J.B., asking repeatedly: "What am I going to do with you?" J.B. was apprehensive because it was almost 4:30 p.m., at which time everyone else would leave chambers, leaving her "trapped" with Respondent. Consequently, when Respondent approached J.B. as if he were going to hug her, she was relieved because she thought that the episode was over.

Respondent put his arms around J.B. as if to hug her. After J.B. let him do so, she started to pull away but was unable to because he would not let her go. He pulled J.B. closer so that his face was right in front of hers, and he repeatedly said: "Are you sure?" He said: "You know, I've never forced anyone," and then he kissed J.B., whereupon she threw her head back. Respondent continued to hold J.B., asking again: "Are you sure?" He then let go of her, stepped back and stared at her. From the look on his face, he was enraged, but he said repeatedly: "Are you sure?"

Respondent walked to his desk, still repeating the question: "Are you sure?" without looking at J.B. J.B. finally replied that she was sure, and she left Respondent's chambers.

As was her usual custom, when J.B. left she met two other women law clerks and walked with them to the parking area where they kept their cars. She was obviously upset and, after prodding by the other clerks, told them that the judge had kissed her against her wishes. That evening, J.B. telephoned a former law professor who suggested that she memorialize what had happened that day. The e-mail J.B. sent, also that evening, was direct and detailed. The ACJC description of her interaction with the judge captures the essence of J.B.'s communication to her law professor.

After her job interview on Monday, J.B. called the vicinage Equal Employment Opportunity (EEO) Officer, who asked her to come in the next day, which she did. She was informed that she had been assigned to another judge and that she was not required to return to work until the following week.[5] On that same Monday, respondent learned of J.B.'s allegation and instructed his secretary not to talk to J.B. on the phone. Some time later, he requested that his secretary type his version of what had occurred. The decision to make that request was unfortunate because it suggests respondent wanted his secretary to know his version of the facts. Indeed, when she was asked at the ACJC hearing whether "those things with which [she was] familiar ... were ... treated accurately in the document," she responded, "Some were. Some I was not witness[ ] to. Some were not exactly as I recall things happening."

Respondent's version is consistent with J.B.'s version in that he also states that she sought his advice about her upcoming job

_____

[5] An EEO complaint was filed on June 22, 2003, and the matter was placed in the hands of an investigator from the Administrative Office of the Courts in Trenton. After the investigation, the Acting Administrative Director of the Courts determined that Judge Subryan had violated the Judiciary's Policy Statement on Equal Employment Opportunity, Affirmative Action and Anti–Discrimination by his conduct toward J.B., and referred the matter to the ACJC.

interview and that they had a conversation about the interview in his chambers with the door closed. In his initial written statement to the EEO investigator, however, respondent claimed that after the conversation, J.B. thanked him for his advice and then left. Later, when the investigator interviewed respondent, he said J.B. hugged and kissed him on the cheek before she left. We observe also that, in describing his previous interactions with J.B., respondent made certain admissions but generally understated or denied prior acts and conversations.

### ■ The ACJC found that

J.B. was a very credible witness, not only in terms of her demeanor while testifying but also with regard to the logical consistency of her actions. When Respondent and she were alone in chambers on May 30, she was initially unafraid. She had a comfortable relationship with Respondent and had engaged in friendly banter with him in the past; and she attempted to do so on that occasion as well. She was a mature woman who had traveled extensively before entering law school. When Respondent's attitude changed, she became first apprehensive and then relieved when she thought he was trying to hug her as a sign of conciliation. When she realized that he was serious in his approach toward her, she became frightened because she thought she was trapped and would soon be alone with him because it was almost quitting time. And when Respondent kept asking her if she were sure, J.B. took that as an indirect threat against her legal career.

We find that the record supports the Committee's view of J.B. We are also persuaded that J.B.'s demeanor when she met with the other law clerks after the incident, along with her unwavering story to the law clerks, to her law school professor, to the investigators, and at the ACJC hearing, provides strong support for her claim.

Respondent not only denies that he ever kissed J.B. against her will, but highlights discrepancies in J.B.'s account that he claims make her testimony untrustworthy. The ACJC considered those claims and gave them little, if any, weight. By way of example, J.B. stated on her resumé that she worked for an opera company for ten years and later said that she worked there only seven years. She also improperly listed a class paper as a law review article on her resumé, thereby exaggerating her credentials to obtain employment. Although, we do not condone such misrepre-

sentation, we cannot say that it outweighs the credible testimony of J.B. and other corroborating witnesses.

Respondent's attack on J.B.'s character focuses, however, on the question whether she fabricated her job interview in the first place so as to have an excuse to see him in chambers privately. Then, it is suggested, she could—and did—make up a story that would form the basis for a sexual harassment lawsuit. To substantiate that hypothesis, respondent attempted to prove that J.B. could not have gone to a job interview on Long Island that Monday, June 2, because she spoke to an EEO officer and a Human Resources manager at the courthouse that day. Those two judiciary employees testified that J.B. was at the courthouse in Paterson when she claimed that she was in New York at her interview. In response, J.B. averred that she spoke to the two employees by phone after she returned from her interview. E–ZPass and telephone billing records corroborate J.B.'s story; the informal notes of the EEO officer indicate only that there was a conversation with J.B. on June 2 and a meeting with her on June 3.[6] On those facts, we do not find respondent's hypothesis credible.

We find that there is clear and convincing evidence that on May 30, 2003, respondent made an unwanted advance to J.B., and that his behavior violated Canons 1 and 2A of the *Code of Judicial Conduct* and *Rule* 2:15–8(a)(6).

### III.

Canon 1 of the *Code of Judicial Conduct* requires judges to "[up]hold the [i]ntegrity and [i]ndependence of the [j]udiciary,"

---

[6] In an affidavit submitted to the ACJC, an attorney at a New York firm explained that he did not remember meeting J.B., but that her story about the interview was not inconsistent with what he did remember. He and another lawyer were considering candidates for associate positions between December 2002 and May 2003 in Staten Island and in Melville, Long Island. He recalled "that a young woman from New Jersey was a candidate for employment and that she had an existing commitment that prevented her from starting immediately in the event an offer of employment was extended to her." The affidavit also corroborates J.B.'s story.

and Canon 2A requires judges to "respect and comply with the law and ... promote[ ] public confidence in the integrity and impartiality of the judiciary." Similarly, *Rule* 2:15–8(a)(6) prohibits judges from engaging in "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." Respondent has violated Canons 1 and 2, and *Rule* 2:15–8(a)(6). It remains for us to determine the quantum of discipline to impose in this case.

We begin with the purpose underlying judicial discipline:

> The single overriding rationale behind our system of judicial discipline is the preservation of public confidence in the integrity and the independence of the judiciary. As we have noted before, 'This Court cannot allow the integrity of the judicial process to be compromised in any way by a member of either the Bench or the Bar.' Accordingly, institutional concerns figure prominently in cases involving judicial discipline. As the Supreme Court of Minnesota has observed, the standard of judicial conduct is a high one precisely 'so that the integrity and independence of the judiciary may be preserved.' Judicial misconduct 'brings the judicial office into disrepute and thereby prejudices the administration of justice ... and diminishes public respect for the judiciary.'
>
> [*Seaman, supra,* 133 *N.J.* at 96–97, 627 *A.*2d 106 (citations omitted).]

Accordingly, once the Court decides that there has been a breach of judicial ethics, its goal "is not so much to punish the offending judge as to 'restore and maintain the dignity and honor of the position and to protect the public from future excesses.'" *Id.* at 97, 627 *A.*2d 106 (quoting *In re Buchanan,* 669 *P.*2d 1248, 1250 (Wash. 1983)).

In determining an appropriate sanction, the Court undertakes a "searching and expansive" inquiry, in which various factors are weighed. *Seaman, supra,* 133 *N.J.* at 98, 627 *A.*2d 106. "Among the surrounding circumstances to which we give heed are ... considerations of public policy," including the State's commitment to ending gender discrimination and, particularly, sexual harassment. *Ibid.* Other relevant considerations include "whether the misconduct involves a misuse of judicial authority[,] ... is unbecoming and inappropriate for one holding the position of a judge, ... [or] has been harmful to others." *Id.* at 99, 627 *A.*2d

106. On the other side of the scale we weigh whether "a matter represents the first complaint against a judge, ... the length and ... quality of the judge's tenure in office, [the judge's] personal and professional reputation, [his or her] sincere commitment to overcoming the fault, [and his or her] remorse and attempts at apology or reparations to the victim." *Id.* at 100, 627 *A.*2d 106. "We have also found relevant consideration of whether a judge found guilty of misconduct will engage in similar misconduct in the future, or whether the inappropriate behavior is susceptible to modification." *Ibid.*

In this case, we are mindful of Judge Subryan's personal and professional achievements. Respondent's judicial record and public service have been exemplary and his life story is an inspiration. Judge Subryan grew up in Guyana, then British Guiana. One of thirteen children from a family of modest means, he attended high school on a scholarship while working as a laborer cleaning the hulls of ships. When he graduated, he served as a teacher's aide and a customs officer before leaving his country of birth for England where he obtained his LL.B. with honors from the University of London. He taught law in England and returned home to practice in Guyana until 1978, when he immigrated to the United States.

In this country, while employed in a clerical job, Judge Subryan attended Rutgers Law School for the one additional year of study necessary to obtain an American law degree. After working for a private law firm, and after over ten years in the Passaic County prosecutor's office, in July 1993 he was appointed a judge of the Superior Court, the first Asian American judge in New Jersey. He chaired the Passaic County Vicinage XI Advisory Committee on Minority Concerns and was vice-chair of the Supreme Court Committee on Minority Concerns. He is the recipient of many awards, including among others the Asian American Heritage Council President's Award, Overseas Indian Congress of U.S.A. Award for Exemplary Service to Asian Americans, Asian Pacific Lawyers Association of New Jersey Achievement Award, and the

National Asian Pacific American Bar Association Trailblazers Award. Moreover, the record contains numerous letters describing Judge Subryan as a deeply religious and caring person with high moral values, a man who treats litigants fairly and maintains a professional and efficient courtroom.

Judge Subryan has led an admirable life of hard work and public service and has been a role model for others, on and off the bench. When contrasted with his accomplishments, respondent's behavior in his chambers and during the incident of May 30 appears inexplicable. We must consider that dichotomy in an effort fairly to determine an appropriate sanction.

We begin with the understanding that the judge's conduct is unacceptable in any workplace setting, and that it is particularly troubling in the context of the judge-law clerk relationship because of the inequality inherent in that relationship. In our system, the judge is a teacher, a mentor, an advisor, a source of referrals and a source of recommendations for his or her clerks. When that authority is exercised responsibly, the clerkship year stands out as a highlight in an attorney's professional life; when that authority is abused, certainly the clerk and, also, the judiciary are harmed. In imposing a two-month suspension in *Seaman*, we stated that

> [t]he judge-clerk relationship is unique. The importance of a judicial clerkship to the career of a young lawyer can be enormous. A judicial clerkship can be an auspicious beginning to a legal career. Judicial clerkships are marked by both strong dependence and a significant power imbalance between judge and clerk. The vulnerability of a clerk to a judge is even greater than that in most supervisor-employee relationships. By alienating his or her judge, a clerk risks great professional jeopardy.
>
> [133 *N.J.* at 94, 627 *A.2d* 106 (citations omitted).]

In such circumstances, sexual harassment by a judge "debilitates its victims and has, as its ultimate effect, the ... subordination of women." *Id.* at 100, 627 *A.2d* 106.

In part because each case is unique and requires individualized assessment, reasonable people may disagree about whether a greater or a lesser sanction is required. In light of the serious-

ness of respondent's misconduct, we cannot agree with the ACJC that a censure is appropriate in this case. Accordingly, we hold that respondent shall be suspended for two months without pay from his judicial duties. We believe that a two-month suspension underscores the importance to the judiciary and to the public of a workplace free of gender discrimination and sexual harassment.

So ordered.

## ORDER

This matter having come before the Court on a presentment of the Advisory Committee on Judicial Conduct, and respondent having been Ordered to Show Cause why he should not be publicly disciplined, and good cause appearing;

IT IS ORDERED that JUDGE RANDOLPH M. SUBRYAN is hereby suspended from the performance of his judicial duties, without pay, for two months, effective July 1, 2006, through August 31, 2006.

*For suspension*—Chief Justice PORITZ, LONG, LaVECCHIA, ŻAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.