24 A.3d 277

IN THE MATTER OF STEVEN P. PERSKIE, A FORMER
JUDGE OF THE SUPERIOR COURT.

Argued June 14, 2011—Decided August 1, 2011.

*Candace Moody,* Disciplinary Counsel, argued the cause on behalf of the Advisory Committee on Judicial Conduct.

*Frank L. Corrado* argued the cause for respondent (*Barry, Corrado, Grassi & Gibson,* attorneys).

PER CURIAM.

This matter involves a now-retired Judge of the Superior Court, whose behavior was challenged by a litigant appearing before him

in a contentious case. Based on his actions both in the courtroom and before the Senate Judiciary Committee, the Advisory Committee on Judicial Conduct (ACJC) found violations of the *Code of Judicial Conduct* and recommended that respondent be censured.

Because respondent has accepted responsibility for two of the three ethical violations substantiated by the ACJC, we review the facts underlying those claims, as found in the Presentment, and thereafter direct our focused attention on the grave allegation that respondent exhibited a lack of candor when testifying before the Senate Judiciary Committee.

Based on our exacting review of this record, we find that the ACJC has not met its burden to show by clear and convincing evidence that respondent deliberately misled the Senate Judiciary Committee in his testimony. We therefore adopt the Presentment of the ACJC in respect of the other two violations, and impose censure in accordance with this opinion.

## I.

### A.

Respondent Steven P. Perskie was admitted to the Bar of the State of New Jersey in 1969. At all times relevant to the instant proceeding, respondent was a New Jersey Superior Court Judge, serving in both the Civil and Chancery Divisions of the Atlantic Vicinage. Respondent ultimately retired from the judiciary on February 1, 2010.

On July 23, 2008, Alan P. Rosefielde, a litigant in *Kaye v. Rosefielde*, Docket No. ATL–C–000017–05, filed a complaint against respondent with the ACJC. As stated in the Presentment, the complaint related to respondent's management of the *Kaye* case, and specifically alleged

(1) that Respondent inappropriately failed to recuse himself from presiding over *Kaye* despite a conflict of interest with an individual named Frank Siracusa, a witness in the case; and (2) that Respondent inappropriately appeared in the back of another judge's courtroom while *Kaye* was being tried despite being recused from the case at that point in time.

Following respondent's October 2008 appearance before the New Jersey Senate Judiciary Committee in connection with his reappointment as a Superior Court Judge, Rosefielde's complaint was amended to include an allegation that respondent had deliberately misled the Committee when asked about his conduct in the *Kaye* case. In response to these allegations, the ACJC conducted an extensive investigation of respondent's challenged behavior.

The ACJC filed a formal complaint against respondent on September 9, 2009, charging violations of Canons 1, 2A, 2B, and 3C(1) of the *Code of Judicial Conduct* and *Rule* 1:12–1(f) of the *New Jersey Court Rules*. Following a hearing, the ACJC issued its Presentment, which concluded that all three counts of the complaint were substantiated by clear and convincing evidence. The ACJC found violations of Canon 1 (respondent should observe high standards of conduct to preserve integrity and independence of judiciary), Canon 2A (respondent should conduct himself so as to promote public confidence in integrity and impartiality of judiciary), Canon 2B (respondent should not lend prestige of his office to advance private interest), and Canon 3C(1) (respondent should disqualify himself where impartiality might reasonably be questioned) of the *Code of Judicial Conduct*. The ACJC also found a violation of *Rule* 1:12–1(f) of the *New Jersey Court Rules*, which requires a judge to disqualify himself or herself where a party might reasonably believe that the judge could not be fair or unbiased in the proceedings.

Despite acknowledging respondent's "lengthy and distinguished service to the State of New Jersey both as a judicial officer and a legislator," the ACJC recommended that respondent be censured for the conduct underlying this complaint.

## B.

■ Although respondent has accepted responsibility for Counts I and III of the Formal Complaint, as presented to this Court in the ACJC's Presentment, we include the following por-

tions of the Presentment, covering those Counts, as relevant background to our consideration of the contested Count II.

Count I addresses respondent's failure to disqualify himself from presiding over the *Kaye v. Rosefielde* case. Respondent presided over the *Kaye* case from February 2005 to October 2006. In essence, the *Kaye* litigation was a business dispute involving various issues stemming from Mr. Rosefielde's employment with a time-share business based in Atlantic City, the Flagship Resorts Development Corporation (Flagship), and his eventual termination from Flagship. Mr. Rosefielde maintained that his termination was a result of his recommendation that Flagship end its business relationship with an insurance broker, Frank Siracusa, who according to Rosefielde, allegedly had engaged in improper and questionable business practices. As found in the Presentment, the ACJC concluded that "objective, reasonable and fully informed observers would have sincere doubts about Respondent's impartiality based on Mr. Siracusa's role in the case and the nature and extent of Respondent's relationship with Mr. Siracusa." The ACJC explained its findings and conclusions as to Count I in great detail. We incorporate its explanation herein and set it forth below:

> We start with the undisputed evidence that Mr. Siracusa was a central witness to Mr. Rosefielde's counterclaim in *Kaye*, and that his testimony would present credibility issues for Respondent. Both of Mr. Rosefielde's attorneys corroborated Mr. Siracusa's centrality, and Respondent contested neither Mr. Siracusa's centrality nor the fact that, at some point during the proceedings, he realized he may have to judge Mr. Siracusa's credibility. Further, the record from the underlying case shows that Mr. Fram[, one of Mr. Rosefield's attorneys in the *Kaye* matter,] brought up Mr. Siracusa on numerous occasions and, at one time, specifically described him as a "pretty important witness." That record also indicates that some of Mr. Siracusa's business practices and their legitimacy, in the context of the legality of Mr. Rosefielde's termination from Flagship, were at issue in the case. We find it irrefutable, therefore, that Mr. Siracusa was to play a key role in *Kaye*, and that evidence of that centrality was appropriately raised to and known by Respondent.
>
> We next address the issue of Respondent's relationship with Mr. Siracusa to determine if it could cause a reasonable and fully informed observer to question Respondent's ability to remain in the case and be impartial. Although Respondent's relationship with Mr. Siracusa is multifaceted, we find most disquieting the longstanding and ongoing business relationship between them. Respondent testi-

fied that from the 1970s until the present, he has and continues to purchase insurance from Mr. Siracusa's insurance agency, including his automobile and homeowner's insurance. Mr. Siracusa's insurance agency is, of course, the very one at issue in the *Kaye* case and the exact agency with which Mr. Rosefielde suggested Flagship terminate its business relationship. Put succinctly, Respondent had, at the time, a thirty-five year old business relationship with the very agency whose cessation of business with Flagship was salient to the *Kaye* litigation. Such circumstances demanded Respondent's recusal. In our view, a reasonable, outside observer might think it impossible for such a relationship to not impact Respondent's official, judicial consideration of the Siracusa business. Such doubts are unacceptable and the exact sentiment the rules on judicial disqualification are designed to prevent. *Cf. In re Sciuto,* 2003 N.J. Lexis 1132 (2003) (adopting ACJC's Presentment in ACJC 2000–105) (censuring retired judge for presiding over two cases in which he had a conflict of interest due to his ongoing involvement in financial dealings with a party and the party's attorney).

Notwithstanding the foregoing, the details of Respondent's relationship with Mr. Siracusa do not stop there. Mr. Siracusa supported Respondent's efforts to obtain public office in the 1970s and early 1980s, including donating personally to his campaigns, fundraising for him, and acting as his Campaign Treasurer. While we recognize this association is dated, it is, nevertheless, a political association. As the Supreme Court recently took note, the world of politics and the domain of the judiciary should remain fixedly separate. *In re Boggia,* 203 N.J. 1, 8, 998 A.2d 949 (2010) (recognizing the need for an absolute and complete separation of the judiciary from politics "to ensure that the judicial branch operates independently of political influence and, consequently, to maintain public confidence in the integrity and impartiality of our system of justice.") While there certainly has been no suggestion, nor do we suggest, that Respondent engaged in any inappropriate political activity during his tenure as a Superior Court judge, we believe that the fact that Respondent's historical interaction with Mr. Siracusa was political in nature cannot be overlooked or underplayed in a judicial disqualification analysis.

Respondent and Mr. Siracusa were associated in other noteworthy ways as well. Both individuals testified they worked extensively with one another in connection with the effort to bring legalized gambling to Atlantic City. They were partners in a failed business venture in Atlantic City. More recently, they played bridge with one another on an often monthly, if not weekly, basis over a span of, at a minimum, three to five years. Respondent testified that the games ended in the late 1990s; Mr. Siracusa testified they continued until 2000. Both Respondent and Mr. Siracusa agree that the games occasionally took place at Mr. Siracusa's personal residence, and Mr. Siracusa claims that they also took place at Respondent's house. They would also regularly see one another at lunch, although not dine with one another. Accordingly, in addition to the continuing business connection between Respondent and Mr. Siracusa, their relationship had meaningful political and social aspects to it as well.

Finally, we cannot ignore the fact that Respondent himself now appears to concede a conflict with Mr. Siracusa. Respondent testified during the ACJC hearing that, despite what he indicated to the *Kaye* parties, not only was he "never" going to be in the "position of evaluating [Mr. Siracusa's] credibility," he

further would not have felt "comfortable" evaluating Mr. Siracusa's credibility. He maintained that he remained in the case based on his internal decision to grant a jury trial. We neither delve into nor accept Respondent's professed theory that a jury might somehow absolve or protect him from his now admitted conflict of interest with Mr. Siracusa. Indeed, the fact that Respondent acknowledges *any* issue with judging Mr. Siracusa's credibility is, in our view, dispositive of the question of whether Respondent should have recused himself from *Kaye* earlier than he did. He should have.

When all of the foregoing is considered cumulatively and in the context of the *DeNike* test [*DeNike v. Cupo,* 196 *N.J.* 502, 958 *A.*2d 446 (2008) ], as well as the standards enunciated in Canon 3C(1) and *Rule* 1:12–1(f), we find that Count I of the Formal Complaint against Respondent has been proven by clear and convincing evidence. We believe a reasonable, objective person, fully informed about the longstanding and continuing business relationship between Respondent and Mr. Siracusa's insurance agency, as well as the political, social and personal connections between the two individuals, would have significant doubts as to Respondent's ability to be impartial, minimally, with respect to Mr. Siracusa's involvement in the case.

We would be remiss if we failed to note that additional, legitimate questions about Respondent's ability to be impartial in *Kaye* are raised by what we now know about Respondent's handling of the Siracusa issue, *i.e.* that Respondent never revealed the details of that relationship in full and, what he did reveal, was done in snippets. This failure adds to the appearance of his partiality in *Kaye*. Though Respondent suggests he deliberately avoided advising the *Kaye* parties as to his complete connections with Mr. Siracusa in accordance with his philosophy to "stay out of the way" of substantive issues, we cannot accept that judges can avoid potential motions for recusal by deliberately failing to be fully forthcoming and candid.

For all of these reasons, coupled with Respondent's own belated concession of a conflict, we conclude that Respondent violated Canons 1, 2A, and 3C (1) of the *Code of Judicial Conduct* and *Rule* 1:12–1(f) of the New Jersey Court Rules. Respondent failed to disqualify himself from *Kaye* in accordance with pertinent strictures, and by this conduct, failed to uphold the integrity and independence of the Judiciary and failed to promote public confidence therein.

[ (footnotes omitted).]

■ With respect to the related Count III, which addressed respondent's behavior in respect of the *Kaye* litigation after he had recused himself from the matter, the ACJC's findings and conclusions, accepted by respondent and also incorporated herein, are set forth in full below.

Count III of the Formal Complaint charges that Respondent made two appearances in the back of Judge Nugent's courtroom during the *Kaye* trial after Respondent had recused himself on his own motion from the case, and that those appearances were "inappropriate and demonstrated or created the appearance that

Respondent had an interest in or supported the plaintiffs'' case. Respondent admits making the appearances, remaining in Judge Nugent's courtroom for approximately one hour on each occasion, and speaking with one of Mr. Kaye's attorneys during his second appearance.

While there are factual disputes concerning the exact day of Respondent's second appearance, who he spoke with on that occasion, and what exactly was discussed, those disputes do not need to be resolved for the purposes of our disposition of Count III. For our purposes, it is sufficient that Respondent not only admits the two uninvited appearances, he also concedes, as pointed out by his attorney in his Post–Hearing Brief, that "he should not have gone into Judge Nugent's courtroom, or spoken to plaintiff's counsel, after having recused himself from the [Kaye] case. In these circumstances, that conduct was ill-considered. . . ." [ ]

We could not agree with Respondent more. As we indicated previously, recusal connotes and demands complete separation. By appearing and staying in the back of Judge Nugent's courtroom to watch the *Kaye* trial after he had recused himself from the case, Respondent deviated from that demand not once, but twice. In so doing, he created, at a minimum, the unacceptable appearance that he still had an interest in the case. In fact, both Mr. Rosefielde and Mr. Fram were impacted by Respondent's appearances and interpreted those appearances as a show of support for the plaintiffs. Given the history of Respondent's interface with *Kaye*, we find their interpretation reasonable and further believe that a reasonable, objective observer might have the same reaction or, at a minimum, question the motivation behind Respondent's visits. Either way, such questions demonstrate the impropriety of Respondent's conduct under the *Code of Judicial Conduct.* The mandate, expected of all judicial officers, to maintain and uphold the integrity and independence of the Judiciary is sacrosanct and without limit. *See* Canons 1 and 2 of the *Code of Judicial Conduct.* By personally appearing and observing the trial of a case from which he was recused on two separate occasions, Respondent allowed that integrity and independence to be called into question and, consequently, flouted his judicial obligations and responsibilities. As a result of this finding, we further conclude that Respondent's conduct violated Canons 1, 2A and 2B of the *Code of Judicial Conduct.*

One final note: Respondent's purported "intellectual" interest in the testimony he observed and whether he intended his appearance to have the effect it did are of no moment and, quite frankly, irrelevant to our analysis. Due to his recusal, Respondent was obligated to remain completely disassociated from the case. We remind Respondent that the Commentary to Canon 2 warns that judges "must expect to be the subject of constant public scrutiny." Respondent's conduct invited that scrutiny and, accordingly, he cannot avoid its repercussions now.

## II.

Respondent has accepted the Committee's findings with respect to Counts I and III of the Presentment against him. Before this Court he has conceded that his conduct, described in those Counts

of the Presentment, violated the cited Canons of the *Code of Judicial Conduct* and *Rule* 1:12–1(f). Importantly, we independently find that respondent's conduct as set forth in Counts I and III of the Presentment violated Canons 1, 2A and 2B, and 3C(1) of the *Code of Judicial Conduct* and *Rule* 1:12–1(f)'s standards for judicial behavior in respect of the handling of a recusal issue. There is more that we must consider, however.

Although respondent accepts the findings in respect of Counts I and III, he contests the Committee's findings with respect to Count II of the Presentment. Count II charges that respondent demonstrated a lack of candor when he testified before the New Jersey State Senate's Judiciary Committee in response to questioning concerning his conduct in the *Kaye* case, and focuses specifically on his responses to the charges that 1) he inappropriately failed to recuse himself from presiding over *Kaye* despite a conflict of interest with Siracusa, a prospective witness in the case; and 2) he inappropriately appeared in the courtroom of another judge during the *Kaye* trial on two occasions.

Rosefielde had sent a nine-page letter, dated October 10, 2008, to the Chairman of the Judiciary Committee detailing his complaints and the Committee had provided respondent with a copy of the letter in advance of his testimony before the Committee. Respondent admits he read Rosefielde's letter before he gave testimony to the Committee on October 16, 2008.

When questioned by a member of the Senate Judiciary Committee about his failure to recuse himself in *Kaye* despite his association with Siracusa, respondent testified under oath that

> when the matter was first presented to me, it was suggested that there was an individual [Siracusa] who was not a party to the case. He was neither a plaintiff nor a defendant, nor was he going to be a witness. His name was going to be used or referred to in the course of the testimony with respect to one or several issues.
>
> I indicated that if he, indeed, had been a party or a witness in the case that I would not hear the case. But because he was neither going to be a witness nor a party, there was no reason at that point that I should not hear the case. And at that point, on that basis, I declined to excuse myself from the case. Later on, for unrelated reasons having to do with matters that made me uncomfortable, on my own motion I excused myself from the case and it was assigned to another judge.

When questioned further by the Committee, respondent denied that he excused himself from *Kaye* due to the Siracusa conflict,

> [b]ecause the individual in question was never going to be a witness in the case. His name was going to be referred to by some of the witnesses. But his credibility and his interests were never going to be involved in the case. If they had been—I put it on the record. If he were going to be a witness and I had to evaluate his credibility, or if he were going to be a party and interests that he had were at stake, I should not be in the case. And I said that. But he was not.

Respondent's testimony before the Committee was wrong as even he now concedes. Siracusa had in fact been identified by Rosefielde's trial attorney as a potential witness in *Kaye* and characterized as an important witness. The transcripts from the *Kaye v. Rosefielde* proceedings contain several exchanges between respondent and counsel concerning respondent's position if Siracusa should be called as a witness before him. On October 12, 2005, respondent stated that he did not perceive that his "historic relationship" with Siracusa would pose a problem for him as the judge in the *Kaye* matter, but that the parties would need to make their own determinations on that issue.

On May 26, 2006, respondent presided over a motion hearing and management conference in *Kaye*. At the motion hearing and management conference the following occurred, as stipulated by the parties:

a. Rosefielde's counsel raised the issue that Respondent, as the trier of fact, might have to make credibility determinations with respect to Siracusa, and that in light of Respondent's previously disclosed business relationship with Siracusa, Respondent might "perhaps" want to direct that the claims for which Siracusa's credibility would be an issue be tried to a jury. Rosefielde's counsel described the issue as "a miscellaneous issue that may at some point in the future affect the court's thinking" about the length of the trial.

b. Rosefielde's counsel agreed with Respondent that the issue of a jury trial with respect to those claims that related to Siracusa was not "something [he] need[ed] to decide" then and that the issue could remain open pending further discussion. He further said that Respondent "may want us to give you some more detail— today's probably not the time to do it—about the nature of the transaction and the concerns before you."

. . . .

d. Respondent further opined that:

There is nothing from any of that that from my point of view requires me to recuse on my own motion. But I'm sure I indicated then, and I'll indicate now, if any party has any concerns or questions about it, I'll deal with it.

I don't perceive that there's anything about the nature or extent of my historic relationship with him that would preclude me from making the kind of credibility evaluation of his testimony that I would make of somebody I didn't know.

But I concede that the parties have to be as comfortable about that conclusion as I am. So if anybody has any questions at any point or has concerns about it, I'll be happy to deal with them.

. . . .

And we'll leave the issue open. All I'm saying is that my relationship with him is not such, as it would be, for example, with some other people that I can mention, that I simply would not feel comfortable evaluating their credibility.

On September 8, 2006, respondent again presided over a motion hearing and management conference in *Kaye*. According to the transcripts of that conference and the parties' stipulation, the following occurred:

a. Rosefielde's counsel again raised with Respondent the issues of Respondent's prior and existing and existing relationship with Siracusa, whom he described at that time as "a pretty important witness."

. . . .

c. In response to Rosefielde's counsel, Respondent stated the following:

At the appropriate time, and today isn't it, what somebody's going to need to do is essentially summarize whose witness he would be and what the substance of . . . the testimony that he's presenting . . . If this is a jury trial and . . . if I can't get out of it, the fact that I had and have a relationship with him, wouldn't trouble me in the least. If it's a non-jury trial, and I'm trying it, and his credibility is a factor I would need to determine, that's something I need to think about in whatever the context in which it's presented is.

. . . .

f. Following Respondent's remarks, Rosefielde's counsel advised Respondent that he would like to "tee this issue up in the form of a motion." Respondent agreed that counsel should "tee the issue up in whatever form you think is appropriate."

g. In discussing Rosefielde's decision to file a motion for Respondent's recusal, Respondent indicated that he did not have enough information at that point to recuse himself on his own motion and further stated: "I don't know whether I would need to recuse or not. It's possible, and it's also possible I would not."

h. Rosefielde's counsel said he was not suggesting that Respondent recuse himself on his own motion and added "That's why I want to get the whole context before Your Honor so you can make that decision."

Rosefielde eventually did file a motion to recuse respondent in *Kaye.* Respondent heard the motion on October 6, 2006, and according to the stipulation denied it, stating, remarkably, that:

[e]ven if [Siracusa] were to be called as a witness, my relationship with him in the past would not, in my view, preclude my making any necessary determinations with regard to his credibility.

Respondent also stated that he felt "perfectly comfortable retaining responsibility for the matter even if Mr. Siracusa were to testify."

Respondent, nonetheless, recused himself from *Kaye* at the conclusion of the October 6 motion hearing, citing his "inappropriate reaction" to Rosefielde's counsel at a previous hearing and his "significant concerns" with how the case had been handled.

Respondent's statements, on the record, to the parties in *Kaye* and his testimony before the Senate Judiciary Committee on October 16, 2008, stand in sharp contrast to one another. On the one hand, on at least four separate occasions, respondent advised the parties in *Kaye* that notwithstanding his association with Siracusa, he was not uncomfortable continuing with the case and judging Siracusa's credibility if Siracusa were presented as a witness. On the other hand, respondent told the Senate Committee he only continued to preside over *Kaye* because he had been told Siracusa would be neither a party, nor a witness. Had that not been so, respondent admitted to the Committee that he "should not be in the case."

Respondent acknowledges the inconsistency of his remarks. At the ACJC hearing, respondent insisted that he simply got it wrong, that his testimony before the Senate Judiciary Committee was based on his own recollection of events that had taken place two years before, and that he was not attempting to mislead the Senate Judiciary Committee. The ACJC found that respondent's proffered excuses strained credulity and that it could not accept that a "bad memory" caused such contradictions. The ACJC concluded that respondent was not forthcoming with the members of the Senate Judiciary Committee and that his conduct in that

regard violated Canons 1 and 2A of the *Code of Judicial Conduct.* Important to the ACJC's finding that respondent's excuses lacked credibility was respondent's admission that he had received a copy of Rosefielde's letter of October 10, 2008 to the Chairman of the Senate Judiciary Committee before he testified to the Senate Committee. Indeed, respondent commented to the Senate Committee that it would not "be appropriate for me to go line by line through that eight- or 10-page letter." That letter detailed certain of the exchanges between respondent and the attorney in the *Kaye* matter concerning respondent's associations with Siracusa and whether, in light of those associations, he should continue to preside over *Kaye.*

The issue before us is whether the record supports the finding of guilt on Count Two.

### III.

The matter is before this Court de novo on the record established. *In re Subryan,* 187 *N.J.* 139, 145, 900 *A.*2d 809 (2006); *In re Williams,* 169 *N.J.* 264, 271, 777 *A.*2d 323 (2001). The Court's task is to independently ascertain whether the record demonstrates conduct that departed from the strictures delineated in the Canons of Judicial Conduct. *Williams, supra,* 169 *N.J.* at 271, 777 *A.*2d 323; *In re Seaman,* 133 *N.J.* 67, 74–75, 627 *A.*2d 106 (1993).

Allegations of judicial misconduct must be proven by clear and convincing evidence. *R.* 2:15–15(a); *In re Boggia,* 203 *N.J.* 1, 12, 998 *A.*2d 949 (2010). Such a showing is less stringent than the criminal standard of beyond a reasonable doubt, but is more onerous than the general civil preponderance standard. *Liberty Mut. Ins. Co. v. Land,* 186 *N.J.* 163, 169, 892 *A.*2d 1240 (2006). The departure from the traditional preponderance standard is justified in light of the serious consequences that flow from the determination that a judge has violated the *Code of Judicial Conduct. Williams, supra,* 169 *N.J.* at 271–72, 777 *A.*2d 323.

■ To satisfy the intermediate clear-and-convincing standard, the fact finder "must be persuaded that the truth of the contention is 'highly probable.'" 2 *McCormick on Evidence* § 340, at 487 (Broun ed., 6th ed. 2006) (citation omitted). Evidence that is clear and convincing "should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re Purrazzella*, 134 *N.J.* 228, 240, 633 *A.*2d 507 (1993) (quoting *Aiello v. Knoll Golf Club*, 64 *N.J.Super.* 156, 162, 165 *A.*2d 531 (App.Div.1960)). To meet that burden, the evidence must be "so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the precise facts in issue." *Seaman, supra,* 133 *N.J.* at 75, 627 *A.*2d 106 (alteration in original) (quoting *In re Boardwalk Regency Casino License Application,* 180 *N.J.Super.* 324, 339, 434 *A.*2d 1111 (App.Div.1981), *modified,* 90 *N.J.* 361, 447 *A.*2d 1335 (1982)). Notably, evidence that is uncontroverted may nonetheless fail to meet the elevated clear and convincing evidence standard. *Subryan, supra,* 187 *N.J.* at 144, 900 *A.*2d 809 (citing *In re Jobes,* 108 *N.J.* 394, 408, 529 *A.*2d 434 (1987)).

Those standards governing the requisite level of proof are of enormous importance in our review of this matter for we are dutifully mindful of the high threshold that is necessary to sustain a disciplinary violation. Ultimately, *it is our concern about the certainty required to find a violation that is determinative in our holding.* For the reasons that follow, we are not persuaded by our review of the record that the evidence established clearly and convincingly that respondent, in his testimony before the Senate Judiciary Committee, deliberately misled the Committee.

## IV.

■ Respondent admits that his testimony before the Senate Judiciary Committee presented inaccurate information. The question is whether the inaccuracies were the product of honest mistaken recollection or a deliberate attempt to mislead the Committee. Certain facts relative to that inquiry are beyond

dispute. More than two years had elapsed from the time respondent had engaged in the cited exchanges with counsel in the *Kaye* case concerning respondent's Siracusa association and the problems that flowed therefrom. Respondent had not reviewed the transcripts of the *Kaye* conference and motions before he testified in front of the Senate Judiciary Committee on October 16, 2008. The record reflects that copies of those transcripts were not made available to respondent until several days after his testimony concluded, when the transcripts were provided to him by the staff of the ACJC along with a copy of the grievance filed with the ACJC by Rosefielde on July 23, 2008.[1]

Respondent had only his own recollection of the *Kaye* proceedings, which he characterized as an extremely unpleasant experience for him. He knew, however, that he had recused himself on his own motion because of problematic interactions with Rosefielde's counsel in the case, and problems with how the case was being handled, including problems with his own management of the case. He had not recused himself because of Siracusa's role in the case. He also knew that Siracusa had not been called as a witness in the case after all.

It is also true that he had the Rosefielde letter of October 10 before he testified. But he obviously did not credit the credibility of the allegations in that letter against his own recollections of what had occurred. The letter is replete with allegations of corruption against respondent, other members of the judiciary, politicians, Kaye, Siracusa, and others. Given the unpleasant memories of his time spent presiding over the Siracusa case, respondent's choice to trust his own memory over Rosefielde's version of facts, while unwise, is plausible. To respondent, Rosefielde apparently was hardly the harbinger of truth.

The record does not clearly establish that respondent had more information available to him. There is no proof that he had

---

[1] The grievance was dated July 16, 2008, and received by the ACJC on July 23, 2008.

knowledge of the details of Rosefielde's grievance against him, which had been filed with the ACJC, until he was provided with a copy of the grievance by the ACJC staff. That was after his testimony before the Senate Committee concluded, and coincided with the time the *Kaye* conference transcripts were made available to him.

Also in the balance is respondent's heretofore unblemished record as a member of the Bar of this State for over forty years and his distinguished service in all three Branches of our State government. Respondent has not only been a member of the Judiciary, but has held positions of high trust in the Executive and Legislative branches as well.

On this record, we simply cannot say that it has been clearly and convincingly established that respondent deliberately misled a Committee of the Senate that was performing its constitutional function of recommending to the full Senate whether to advise and consent to his reappointment as a Judge of the Superior Court.

That said, this case was an exceedingly difficult one to decide and its outcome extraordinarily close. We lay much of the blame for these difficulties at the feet of respondent. He was extremely lax in his preparation for his reappointment hearing even after he had been alerted to the Rosefielde complaint. He apparently made no effort to obtain copies of the transcripts of the *Kaye* conferences prior to giving his testimony before the Senate Committee. And, after he received copies of the transcripts which unmistakably showed how factually inaccurate his testimony had been, he, in another questionable choice, made no effort to alert the Senate Committee to the errors in his testimony. Calling the error to the Senate's attention certainly would have undercut the allegation that he attempted to mislead the Senate Committee. We do not condone that choice, at all; however, it does not bolster the lack of convincing proof about his knowledge and intent at the time he gave his testimony. In sum, the clear and convincing standard of proof has not been met in respect of Count II.

## V.

For the foregoing reasons, we conclude that respondent, by clear and convincing evidence, violated Canons 1, 2A and 2B, and 3C(1) of the *Code of Judicial Conduct* and *Rule* 1:12–1(f) of the *New Jersey Court Rules,* based on our findings in respect of Counts I and III of the Formal Complaint and Presentment. Before this Court, respondent acknowledged the appropriateness of a censure for his conduct, as found in Counts I and III, in violation of the Judicial Canons and *Rule* 1:12–1(f). Because we independently determine that the proper quantum of discipline for those violations is a censure we hold that respondent shall be censured for the violations found herein.

So ordered.

*For Censure*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, and HOENS, and Judge WEFING (temporarily assigned)—5.

*Opposed*—None.

*Not Participating*—Justices LONG and RIVERA–SOTO—2.

## ORDER

This matter having come before the Court on a presentment of the Advisory Committee on Judicial Conduct, and respondent having been ordered to show cause why he should not be publicly disciplined, and good cause appearing;

It is ORDERED that former Judge Steven P. Perskie is hereby censured.